16265

ALLISON *ET AL.* v. IDEAL LAUNDRY & CLEANERS *ET AL.*

(55 S. E. (2d) 281)

*Messrs. Price & Poag,* of Greenville, *for Appellants,*

*Messrs. Wyche, Burgess & Wofford,* and *Rainey, Fant & Morrah,* all of Greenville, *for Respondents,*

*Messrs. Price & Poag,* of Greenville, *for Appellants, on re-argument,*

*Messrs. Wyche, Burgess & Wofford,* and *Rainey, Fant & Morrah,* all of Greenville, *for Respondents, on re-argument,*

September 21, 1949.

TAYLOR, Justice.

This case arises out of one of the most catastrophic occurrences in the State of South Carolina, certainly within the memory of this generation.

On the late afternoon of November 19, 1946, a terrific explosion took place on the premises of the Ideal Laundry and Cleaners, one of the respondents in this case, located in Greenville, S. C.

From the record it appears that prior to November 1946, the boilers of the Laundry had been fired with coal. Shortly prior to the explosion the proprietors of the Laundry, for the purposes of efficiency and no doubt in some part influenced by the attitude of the City of Greenville with respect to smoke abatement in that City, had had installed on the Laundry premises a Propane Gas System, with accompanying appliances, including a tank of about 6,500 gallons capacity for the purpose of firing the boilers with the gas. It was testified that the use of this gas in firing the boilers was somewhat more efficient than the use of coal and obviously resulted in an almost complete elimination of smoke and soot.

On the particular evening in question, an employee of the laundry noticed a substance escaping from the tank in which the supply of gas was contained which, according to his statement, was of a vaporish nature, giving the impression of fog. This escaping gas was also accompanied by a hissing sound which was quite noticeable. Immediately upon these facts having been brought to the notice of the operators of the Laundry, the fire department was called and the building cleared of employees and apparently everything at the moment was done humanly possible to avoid the tremendous destruction and loss of life which followed.

Despite these precautions, a few moments thereafter the escaped gas was ignited through some unknown means, it not having apparently been determined just what the cause of ignition was, although it was testified that the surrounding community was occupied by a number of colored residences which were heated by means of open fires, and speculation was to the effect that the ignition came about from this fashion. The immediate cause of ignition is immaterial. The explosion which ensued was heard and felt in some slight degree as far away as 60 miles and as above stated, several lives were lost and a number of houses immediately adjacent to the laundry were completely destroyed and numerous buildings more remotely situated were damaged to a lesser degree.

The instant case involves the destruction of a house and apartment outbuildings which were situated quite near the laundry.

On the trial of the case before the Honorable William H. Grimball, Presiding Judge, at the close of all of the testimony he directed a verdict on motion of respondents in favor of all of the defendants in this case with the exception of Superior Gas Corporation (which had gone bankrupt prior to the trial, and presented no defense), the substance of his Order being that the installation of the tank and other appliances having been performed by the Superior Gas Corporation, an independent contractor, and there being, in the opinion of the learned Judge, no evidence of negligence on the part of the respondent, Ideal Laundry and Cleaners, nor on the part of the remaining respondents, it was proper to grant the motion for a directed verdict.

Appellants rely upon the contended absolute liability of the owner of the premises for such injuries as resulted from the escape of the gas upon his premises, irrespective of negligence on his part. This doctrine appears to have been first announced in the English case of *Fletcher v. Rylands,* 1886, L. R. 1 Exch. 265, 1 Eng. Rul. Cas. 236, Exch., af-

firmed in, 1868, L. R. 3 H. L. 330, 1 Eng. Rul. Cas. 256. It has been followed by comparatively few courts in this country and may be said to be generally repudiated here. See Annotation, 169 A. L. R. 517 and *Hunter v. Pelham Mills,* 1898, 52 S. C. 279, 29 S. E. 727, 68 Am. St. Rep. 904, as illustrative of the majority rule.

However, there is a well established exception to the general rule of non-liability where injury results and the means or manner of the activity of the owner, whether done by independent contractor or not, may be found to be inherently or intrinsically dangerous to others.

For discussion of the established exception to the rule of non-liability of the employer for acts of negligence of his independent contractor where the work involves inherent or intrinsic danger, see 27 Am. Jur. 517, Independent Contractors, Sec. 39, 57 C. J. S., Master and Servant, § 590, page 359. Annotations: 65 L. R. A. 833; 23 A. L. R. 1084; 76 A. L. R. 1257; A. L. I. Restatement, Torts, Negligence, 1142 *et seq.,* Sec. 423, also p. 1147 *et seq.,* Sec. 427. A well considered case is *Davis v. Summerfield,* 133 N. C. 325, 45 S. E. 654, 63 L. R. A. 492.

The substance of the exception which raises this question was recognized and stated in our old case of *Conlin v. City Council,* 15 Rich. 201 (of historical interest because it contains the story of the first attempt after the Confederate War to replace the bell in the tower of St. Michael's Church, Charleston, resulting in the tragedy which gave rise to the litigation). Defense to liability for wrongful death included the claim that the negligence, if any, was that of an independent contractor or his servant. In remanding the case for new trial the court said: "If the work involved the creation of a nuisance, owner and contractor become joint wrongdoers, and neither (either?) or both must answer for consequences." Nuisance there was used to connote a condition of danger to others, temporarily, pending completion of the work. The definition as given in 2 Bouvier's Law

Dictionary, Rawle's Third Revision, is: "Anything that unlawfully worketh hurt, inconvenience, or damage. 3 Bla. Com. 5, 216. See Cooley, Torts 670."

Relied upon as *contra* is *Rogers v. Florence R. Co.,* 31 S. C. 378, 9 S. E. 1059, but an examination of that case discloses that the point under discussion was not made. Secondly, it is common knowledge that fire (involved in that case) is a useful and frequent agency in the disposal of debris from newly cleared land which was the business there. The danger of it is clearly not comparable to the danger which is now known to be inherent in the storage and use of a large quantity of propane gas in a populated district of a metropolitan area. It would not impinge upon the authority of the *Rogers case* to hold that the facts of this case remove it from the rule stated therein and place it in the exception to the rule of non-liability for the negligence of an independent contractor except for one factor, to which we turn.

Liability of the employer in such cases depends upon his antecedent knowledge of the danger inherent in the work or a finding that the average, reasonably prudent man or corporation should, in the exercise of due diligence, have known. "Obviously the determining factor is knowledge, actual or implied, on the part of the employer of the dangerous nature of the work." *Luthringer v. Moore,* Cal. Sup. 1947, 181 P. (2d) 89, 98.

A review of the evidence, for the purpose of determining whether or not it would support a finding of the jury to the effect that liability would attach to the employer, discloses that the change from coal to gas for fuel was the result of pressure put upon the laundry by the city authorities to abate smoke. The executive head of the laundry corporation was Mr. Haynie, long experienced in the business. He testified, referring to city officials, as follows: "For four or five years they had almost put me in jail for making so much smoke and I had promised them—the war came along and I prom-

ised as soon as it was humanly possible I would change the fuel to oil or something else in order to eliminate smoke." The daily average expense for coal was $86.00 during the few days of gas operation the cost averaged $125.00 per day. However, Mr. Haynie thought that the real difference in cost would not be as great because the gas was much more efficient than the poor grade of coal which he was able to obtain. The gas installation at the laundry was made in November. Mr. Haynie had had the same contractor to install it several months before in his home, just out of the city limits, where a five hundred gallon storage tank was placed and the gas was used to operate his home furnace, cook stove, water heater and refrigerator. It was satisfactory there and still in use at the time of the trial. The contractor was licensed by the city to follow this business and separate license was procured for each installation in the city.

Before contracting for the conversion of the laundry from coal to propane, Mr. Haynie made investigations of the safety and efficiency of the gas installations at other industrial plants. He went to a cannery near Easley where a propane system had been installed by the same contractor and the storage capacity was about the same as was later installed at the laundry. He found it safe and efficient there. He also visited the glass factory at nearby Laurens where propane had been in use for years and he testified that the storage there was eighteen thousand gallons. He talked with officials of that company with respect to the safety and efficiency of the gas. The head of this glass company testified to safe and satisfactory use of propane since the year 1937; that before installing this system he went to New Jersey and investigated the use of the gas in a plant there; being satisfied of its safety, he had installed an eighteen thousand gallon tank and recently had installed another of thirty thousand gallons; that his factory, located within the city limits of Laurens, consumes a car of ninety thousand gallons of gas every forty-five days.

There is evidence that the use of this type of gas has recently increased in this community and over the nation generally. In the year 1946 five times as much was used as in 1945. The expert, whose evidence and report will be later referred to at more length, gave as his opinion that it is a safe fuel if properly installed and properly serviced. It is much used in industrial plants as well as in homes, and the city of Detroit recenty installed twelve or sixteen tanks of thirty thousand gallons capacity each for use in times of natural gas shortage.

There was no Greenville city ordinance regulating the installation or use of the gas at that time. We do not overlook the ordinance in evidence which referred to petroleum products, of which propane is, but it was plainly applicable to gasoline and the like and required underground storage, whereas the expert testimony shows that aboveground tanks are safer for propane. Moreover, the evidence is all one way that such violations as there may have been of this ordinance, if applicable, were of no causal connection with the explosion. Afterward, a suitable ordinance was enacted by the city, but of course that was hindsight and irrelevant here. When the gas was turned on in the laundry, Mr. Haynie called the office of the city engineer and the smoke abatement officer visited the premises and looked over the installation. However, it is clear that he did not have the technical knowledge or experience to discover the defect. Unfamiliarity of the dangers of this relatively new product seems to have been widespread.

While the shift from coal to gas had been completed to the extent that the latter had been in use for several days before the explosion, the contractor was still supervising the operation and had not billed the laundry under its contract, so nothing had been paid on account of the work. Gas had been added to the tank only a few minutes before the explosion which increased the content to probably about 3,500 gallons, not all of which was involved in the explosion, much

of it burning afterward as a giant torch above the break in the pipe.

The following is quoted from the testimony of Mr. Haynie:

"Q. If you know, did you make all the investigation you could as to the safety or the advisability of using this gas, as you described yesterday? A. I made all the investigations that I knew.

"Q. At the time you put the gas in there did you consider it a safe fuel to use at your plant? A. I would not have put it in under any consideration if I had not believed it was a safe fuel."

On cross-examination he made the following quoted admissions which is the only evidence in the record that any official or employee of the laundry knew, or had reason to believe, that the use of the gas would be "inherently" dangerous:

"Q. Mr. Haynie, of course, you, with your large experience in the business world and traveling, you knew that that propane gas was a terribly dangerous thing if not properly controlled and handled, didn't you? A. It would be like any gas; it would be dangerous unless it was properly installed, yes, sir.

"Q. That is what I am driving at; you knew that, didn't you? A. Yes, sir."

This testimony is unworthy of the weight necessary to ascribe to it, in order to create liability upon the laundry for the negligence of its independent contractor. As said in many of the decisions, which will be found by reference to the annotations cited hereinabove, the rule is difficult of application to varying conditions and circumstances and virtually every case has to be considered on its own peculiar facts. The result is numerous conflicts in the decisions and diametrically opposite conclusions by many courts.

After the explosion the city of Greenville asked the Federal government for aid in the investigation and two experts came from the Bureau of Mines in Pittsburgh. With the cooperation of the city fire department and of the officials of the laundry a thorough investigation was made. Elaborate findings were made and a report prepared, a copy of which was made an exhibit in the trial of this case, which shows, among other things, that a leak occurred in the gas line as the result of defects in its construction and arrangement. Tragic corroboration is the suicide shortly afterward of the contractor's engineer who supervised the installation.

A portion of this report appears as follows:

(1) After viewing the effects of this explosion the investigators can reach but one conclusion in regard to the storage, under high-pressure, of large quantities of a volatile, inflammable material such as propane in a populated area—it is a decidedly hazardous practice. It is evident that more stringeent safeguards relating to the installation of propane systems should be enforced if accidents such as that which occurred at Greenville are to be averted.

(2) It is recognized that propane is an excellent fuel, and that its utilization is desirable, but only under conditions where such use can be accomplished with a minimum of hazard. Where propane fuel is to be used at a high rate, as in an industrial plant, it would appear preferable, from the standpoint of safety, to locate the large volume, high-pressure storage unit at an isolated place, and to transport the gas at low pressure to the point of use.

(3) As this explosion is attributable to failure of certain parts of the piping in the high-pressure side of the propane distributing system, it is evident that more stringent regulations should be drafted, and enforced, regarding the design, durability, and installation of the piping of propane systems. Moreover, it would appear desirable to incorporate in the piping system means of remote, or automatic, control to stop the flow of liquid or gaseous propane in event of failure of

the piping system. Propane systems should be subject to inspection, after installation, by an impartial and properly qualified agency before propane is added to the system.

This, like the subsequent city ordinance, is hindsight. Such findings and conclusions are the result of the investigation of this accident. No previous similar occurrence was mentioned; apparently the experts knew of none. Facts about propane developed by the investigation were not available to the laundry beforehand and so far as the record shows were unknown, generally at least. A standard of due care cannot be fairly fixed by the contemplation of facts generally unknown at the time of the test.

In view of the considerations which have been stated, the laundry, the employer, cannot be justly subjected to liability for the independent contractor's negligence.

For the reasons quoted, such of the exceptions made by appellants which relate to the granting of a directed verdict on behalf of respondents are overruled.

Exceptions 1 through 7 raise questions as to the competency of certain testimony elicited by counsel for respondents. It appears to the Court that, although many of the questions asked and the answers given, do pertain to testimony of a doubtful character, even so, the result of the case must have been the same considering other evidence which was properly admitted and that the admission of such questionable testimony, if error, was harmless.

It is the opinion of this Court that all exceptions should be dismissed and the order appealed from affirmed, and it is so ordered.

BAKER, C. J., and FISHBURNE, STUKES and OXNER, JJ., concur.