289 F.2d 143
 SOUTH CAROLINA NATURAL GAS COMPANY, and South Carolina
Electric and Gas Company, plaintiffs, Appellants,
v.
D. L. PHILLIPS and Phillips Construction Company, Inc.,
defendants and third-party plaintiffs, and Freddie B. King,
Richard King, and Everett King, Individually and as
Co-Partners Trading and Doing Business Under the Name and
Style of King Brothers or King Brothers Construction
Company, third-party defendants, Appellees.
 No. 8201.
 United States Court of Appeals Fourth Circuit.
 Argued Nov. 22, 1960.
Decided March 28, 1961.
 
 Arthur M. Williams, Jr., Columbia, S. C., and G. L. B. Rivers, Charleston, S. C. (Frank B. Gary and Gene V. Pruet, Columbia, S. C., on brief), for appellants.
 Robert McC. Figg, Jr., Charleston, S. C. (William H. Vaughan, Jr., and Charles W. Waring, Charleston, S. C., on brief), for appellees.
 Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 A high pressure gas transmission pipeline belonging to the plaintiff, South Carolina Natural Gas Company, was fractured by a 30-ton Euclid pan earth mover owned by King Brothers, which was being operated by King's employees for the purpose of obtaining earth for use as fill on a nearby construction site. Escaping gas was ignited by sparks created by the steel pan scraping the ruptured pipe, or by contact with the hot manifold of the pan's 300-horsepower engine. The resulting fire was not extinguished until a day and a half later when repairs to the high pressure gas line were completed. Meanwhile, large quantities of gas had escaped and the fire had burden through overhead high voltage electric lines and destroyed a twin-pole electirc line tower, owned by the plintiff, South Carolina Electric and Gas Company. The losses suffered by the gas and electric companies were substantial.
 
 
 2
 To recover their damages, the gas and electric companies filed actions in the District Court against Phillips Construction Company, Inc. and its president, D. L. Phillips,[1] the general contractors on the construction job for which the earth fill being collected by King was destined. The partners doing business as King Brothers were not joined as defendants, for, as to them, there was no diversity of citizenship. At the joint trial of the two actions, the principal question was the responsibility of Phillips for King's fault. A jury returned a verdict for Phillips. On appeal, the question is whether Phillips, the general contactor, is responsible for the acts of King, the subcontractor, which caused the damage.
 
 
 3
 On this record, we find no basis for holding the general contractor legally responsible for the acts of the subcontractor.
 
 
 4
 In March, 1958 Phillips contracted to construct certain housing for Air Force personnel on the Charleston, South Carolina, Air Force Base. In one contract, Phillips subcontracted to King and to Micah Jenkins Nursery the basic grading, grubbing and landscaping. The subcontract required the subcontractors to supply earth fill for the pads for the houses. Under the contract, it is plain that the subcontractors could obtain earth for the pads where they chose, except that the specifications provided it should be obtained 'outside the development area of Government owned property.' So long as the delivered earth was of the kind and quality specified by the general contract, the general contractor had no contractual right to control its procurement.
 
 
 5
 There is no disagreement among the parties that, under the laws of South Carolina, a general contractor, or general employer, is not legally responsible for the collateral torts of a subcontractor, if the subcontractor is an independent contractor within the common meaning of that term. As is held generally, South Carolina's Supreme Court has held that whether or not one is an independent contractor turns upon the extent the general contractor reserves a right to control the manner and the means by which the desired result is to be accomplished. If there is no such reservation, an independent contractual relationship is created, and this relationship is not impaired or altered by the reservation of a right of inspection and approval of the quality of materials furnished and the result of the work.[2]
 
 
 6
 The plaintiffs, accepting this general proposition, complain that the jury was not instructed that the defendant had the burden of proving that King was its independent contractor. Reliance is placed upon cases[3] in which South Carolina's Supreme Court has held that proof that the actor was engaged in work for the general employer establishes a prima facie case, which shifts the burden of going forward with evidence to the general employer if he relies upon the employment agreement to establish his immunity. In the Cooper case, the Court held the grant of a nonsuit improper when the plaintiff had shown that the actor was engaged in work for the defendant, and no employment agreement had been produced, nor had anyone offered proof of the terms of the employment. The Norris case involved two employers, each of whom claimed that the actor was an independent contractor. As to one, a full written employment agreement was produced, which the Court held established the relationship of independent contractor, and, therefore, the Court approved the direction of a verdict in favor of that employer. As to the second, however, there was no written employment agreement, and the Court held that proof that the actor was engaged in work for this employer was sufficient to shift 'the burden of at least going forward with the evidence.'
 
 
 7
 It is clear that the Supreme Court of South Carolina has not treated the burden of going forward with evidence as an evidentiary presumption. Any evidentiary effect is dissipated when the burden is met by the introduction of evidence of the terms of the agreement, and when the proof of the terms of the agreement is uncontradicted, a verdict may properly be directed for the general employer if the proven agreement establishes an independent contractual relationship. This is manifest in the holding as to the first employer in the Norris case, as to whom a direction of a verdict was approved, though the Court held that the case was properly submitted to the jury as to the second employer, who failed to meet the burden of going forward with evidence, or who did so inconclusively leaving the evidence open to conflicting inferences. See, also, Johnson v. Atlantic Coast Line R. Co., 217 S.C. 190, 60 S.E.2d 226.
 
 
 8
 It would have been improper for the Court to have charged the jury, as requested by the plaintiffs, that the burden of proof was upon the defense and thus to convert a burden of going forward with evidence into an ultimate burden of persuasion. The defendant had met the burden of going forward by introducing the written contract. There was no dispute about its terms, no contradiction of them, and no contention that there was any other or supplemental agreement between the parties. Since, under the agreement, King was clearly an independent contractor, the Court could properly have given a binding instruct ion to the jury on this point, as the District Judge, himself, observed in denying the plaintiffs' motions for new trial.
 
 
 9
 The plaintiffs seek to bring themselves into one or more of the exceptions to the general rule that an employer is not legally responsible for the torts of an independent contractor. They say that the work to be done was of such an ultrahazardous nature that the employer ought not to be allowed to procure immunity from liability for the consequence of the work by electing to do it through an independent contractor, and that Phillips directed King to do what King did.
 
 
 10
 Certainly, there are a number of nondelegable duties which one may not transfer to an independent contractor and disclaim responsibility for their nonperformance. One of those duties arises in the conduct of ultrahazardous work. It was established in the blasting cases[4] that one in control of land has such an affirmative duty to his neighbor that he must see for himself that dangerous explosives are not used upon his land in such a way as to injure his neighbor's person or property. He does not discharge that duty merely by engaging an independent contractor to do the work. The principle is stated in the Restatement[5] and has been recognized on several occasions by the Supreme Court of South Carolina.[6]
 
 
 11
 The principle, however, is applicable only to work not of common occurrence which of itself involves risk of serious harm to others. Procurement of borrow is not that kind of work. It is done routinely and commonly without harm to others, and of itself creates no extraordinary risk of harm.
 
 
 12
 The plaintiffs look not to the general nature of the work, the procurement of borrow for the foundation pads, but to the operation of heavy and powerful earth moving equipment immediately above and across a high pressure gas transmission line, particularly after portions of the pipeline had been partially uncovered by the operator and could have been seen by him. Almost any activity which has caused harm would appear highly dangerous, however, when so particularized that the view is restricted to the immediate activity which in fact has caused the harm. If the same equipment had been operated in the vicinity of playing children and the operator did not watch where he was going, he might be charged with recklessness and said to have created grave risk of harm to the children, but that is a risk which does not necessarily inhere in the work of procuring borrow. It is the kind of hazard which may be created by the immediate actor, but which does not arise out of the nature of the work generally to be done.
 
 
 13
 Under the contract, King could have procured the earth wherever he chose. There was nothing in the contract which required him to use his equipment near the gas line. The fact that he used his equipment without regard to the presence of the pipeline resulted in damage to the property of the plaintiffs, but the risk could have been avoided altogether. It was not inherent in the work and the ultrahazardous exception to the general rule of immunity of the general employer is not applicable.
 
 
 14
 There are other affirmative, nondelegable duties imposed by statute and judicial decision. A storekeeper does not escape liability to his customer who falls through an unguarded hole in the floor of the store upon a plea that the hole had been made and left unguarded by an independent contractor. , nor is the storekeeper aided in his effort to escape liability by his previous exaction of a promise by the contractor adequately to guard the hole.[7]
 
 
 15
 Under some circumstances, other affirmative duties may be imposed upon the possessor of realty or of personalty to see that, in its use by others, hazards and nuisances of which the possessor is aware are not permitted to continue,[8] and that structures and excavations he authorizes are confined to lands he posesses.[9]
 
 
 16
 Such affirmative or nondelegable duties arise out of the possessor's control of the thing which causes the harm, the work to be done or of the premises where dangerous conditions are continued. Such a possessor may be a general employer, but such affirmative duties do not arise by reason of that fact. They are concomitants of the right of control which stems from his possession.
 
 
 17
 The defendants here were not in possession of the land where King was procuring the borrow. They had no control of it, and the contract gave them no right to control where or how King procured the needed earth. The basis of the suggested affirmative duties is not present. The defendants, therefore, were under no duty to investigate the source of the earth delivered to the job site by King. Though they had causally received information that King was obtaining the earth from an area near the job site, that circumstance cumstance could not impose upon the defendants a duty to investigate King's legal right to obtain borrow from that area or the possible presence of subjacent utilities.
 
 
 18
 Unless, therefore, the defendants so directed King's work as to make it their own, there is nothing to take the case out of the general rule that they are not legally responsible for the tort of the independent contractor. The question, whether or not they did so direct the work, requires reference to the physical situation and the proven facts.
 
 
 19
 When the United States acquired title to the lands upon which the Charleston Air Force Base is located, it did so subject to certain easements which had been granted by its predecessors in title. One of these easements was to a strip of land one hundred feet in width, running generally North and South, and being adjacent to the Western boundary of the site of the housing development which the defendants had agreed to construct. This easement had been granted to the South Carolina Public Service Authority for the maintenance of electric transmission lines. A transmission line owned by that Authority had been constructed, within this right of way, was present and obviously apparent. On the other side of the right of way of the South Carolina Public Service Authority and adjacent to it was another right of way, also one hundred feet in widty, owned by the plaintiff, south Carolina Electric and Gas Company, upon which it had constructed and was maintaining electric transmission lines on overhead pole towers. Within the boundaries of the right of way of the South Carolina Electric and Gas Company, and roughly in the middle of it, was a third right of way, fifty feet in widty, which had been granted to the plaintiff, South Carolina Antural Gas Company, and in this strip of land the gas pipeline had been placed.
 
 
 20
 Within these rights of way beneath the power lines and close by the worksite was a slight elevation which King had observed. When the need for earth Fill arose, King told Phillips's superintendent, that he proposed to procure the earth from beneath the power lines. The testimony shows that the superintendent's response to this information was that he didn't care where King got the earth. He said he just wanted earth delivered to the job site and the earth pads constructed.
 
 
 21
 King then went to the South Carolina Public Service Authority seeking its permission to remove earth from the elevation beneath its electric line. A representative of that Authority met with King on the ground that King proposed to work, and, thereafter, a letter was written to King containing the permission of the South Carolina Public Service Authority for King to procure the earth. King did not seek the permission of the United States, owner of the fee, nor did he seek the permission of either of the plaintiffs, owners of rights of way West of that of the South Carolina Public Service Authority.
 
 
 22
 Having obtained the consent of South carolina Public Service Authority, King began to remove the earth, but he did not confine himself to the boundaries of that right of way. He strayed over on the rights of way of the plaintiffs, with the unfortunate consequence which gave rise to this litigation.
 
 
 23
 After the accident, an official of the United States wrote to Phillips demanding that the removed earth be replaced with a like quantity. Phillips communicated this demand to King, who complied with it.
 
 
 24
 If the defendants, representing they had obtained the necessary authorizations, had directed King to obtain the earth from the area within the rights of way owned by the plaintiffs, they would have made King's act their own. While the contract gave them no right to issue such instructions to King, to the extent that they did, if King complied, the defendants would have assumed responsibility for King's acts, which they could not avoid by claiming they had no right to do what they did.[10]
 
 
 25
 The actual showing, however, is far from the premise of this principle. Far from directing King to procure the earth from that particular area, the defendant's superintendent, when informed of King's intention, responded that he did not care where King got the earth so long as he got it and delivered it. There was nothing approaching a command or an instruction or even a suggestion. There was no meddling, no exercise of control. It was King's responsibility to deliver borrow to the job site, obtained wherever he chose. The defendant's superintendent did no more than reassert what the contract provided. If a general employer may make suggestions to his independent contractor without destroying the independence of the relationship and losing his general immunity,[11] certainly he may passively receive such information of his contractor's intentions without doing so.
 
 
 26
 There was also evidence that employees of the defendants saw King's equipment procuring earth from beneath the power lines. They could hardly have failed to have seen it, for the area being worked by King was immediately adjacent to the Western boundary of the construction site. Such observation, however, adds nothing to the previous disclosure of King's intention. King had exercised his right to select the area from which the borrow was to be obtained. The defendants' observation that King had selected a particular area did not make the selection that of the defendants. Though Phillips thus knew where King was obtaining the borrow, it had the right to assume that King had obtained sufficient authorization for his work and was exercising appropriate care.
 
 
 27
 The plaintiffs seek to bolster their case by characterizing King's acts as a trespass. He did trespass upon the lands of the United States and was liable for the damage he did the land regardless of any good faith reliance upon the authorization he had obtained from South Carolina Public Service Authority. He acknowledged that liability when he complied with the demand of the United States to replace a like quantiry of earth. Whether he might be held to a similar absolute liability to these plaintiffs,[12] we need not consider, for even if he were, it was still a collateral wrong for which the general employer is not reponsible.
 
 
 28
 If the contract required the commission of a trespass or if the work contracted for necessarily involved the commission of a trespass, the general employer, of course, is reponsible for it.[13] One who hires another to commit a wrong cannot disclaim liability for the harm inflicted. So also, one who advises or directs the commission of a trespass, as of any other wrong, is liable for damages suffered as a result of the performance of the directed act.[14]
 
 
 29
 In these respects, however, trespass stands upon the same footing as other wrongs. One who has contracted for, advised or directed the commission of any tort cannot disclaim responsibility for it. When, however, an independent contractor commits a collateral trespass, as any other collateral tort, he does not impose liability upon his general employer.[15] Characterization of King's interference with the plaintiffs' enjoyment of their rights of way as a trespass does not bear upon the question whether King's acts may be attributed to Phillips.
 
 
 30
 There is no contention that Phillips ratified King's tortious conduct.
 
 
 31
 We conclude that the testimony fails to disclose the breach of any duty owed by Phillips to these plaintiffs.
 
 
 32
 Finally, the plaintiffs complain of the exclusion of a crawing offered as a basis for showing constructive notice to Phillips of the existence of the gas line. This was a drawing prepared by the architect for the housing project and numbered 'OU-8.' It showned streets to be built and utilities to be installed in the off-site area west of the housing site. This drawing also showed the existing rights of way and indicated the presence of the gas line.
 
 
 33
 Drawing OU-8 had not been furnished to Phillips, for all of his work was on the site of the project. Some of the drawings furnished him, however, bore a notation outside the indicated western boundary of the project, 'See Plan OU-8.' Even without such a notation, Phillips must have known that such a drawing had been prepared, for he hardly could have supposed that the roads and utility lines he was to construct to the boundary of the project were not to be extended by others to connect with other roads and utility lines.
 
 
 34
 Had Phillips sought a print of Plan OU-8 he could have found one in the office of the supervising engineer. He had not done so. The plaintiffs charge him with fault in this respect, and they point to the testimony of one of the architects that proper coordination with the work of the off-site contractor would require that Phillips look at Plan OU-8.[16]
 
 
 35
 From these circumstances and from the fact that the existence of their rights of way would have been disclosed by a search of the public records, the plaintiffs conclude that Phillips ahd constructive notice of the presence of the gas line and that Plan OU-8 should have been received in evidence as part of the foundation for that conclusion.
 
 
 36
 The difficulty with the plaintiffs' position is that if assumes duties of investigation and of supervision which were not their due from Phillips.
 
 
 37
 Phillips had only limited rights to supervise King's activities. The right to see that meterials furnished by King met contract specifications and to approve the result of King's work on the site, gave Phillips no right to supervise King's offsite activity in obtaining material to be furnished. Phillips could have no duty to do what he had no right to do. He had no duty to these plaintiffs to see that King fell into no danger and committed no collateral tort. He had no duty to investigate the legal sufficiency of King's right to enter off-site property or to supervise King to see that he stayed within the boundaries of the land covered by such authorization as King had secured. He had no duty to investigate what hazards King might encounter if he strayed over the boundaries of the land covered by his legally insufficient permit.
 
 
 38
 Phillips owed no duty to these plaintiffs of efficient coordination of his work with that later to be done by the off-site contractor. If reference to Plan OU-8 would have enabled him to avoid mistakes he would later be required to correct at his expense, his failure to look at it was no violation of any duty of care owed by him to avoid harm to the person or the property of others.
 
 
 39
 If South Carolina should accept the dictum of Rosenberg v. Schwartz, 260 N.Y. 162, 183 N.E. 282, that a contractor has a duty to act when he 'is present and sees and realizes that a subcontractor is doing his work in an unlawful and dangerous manner,'[17] it requires that he act out of realization, and does not expand his duty of inquiry. With respect to the subcontractor's off-site activity, it places upon the general contractor no duty of inquiry or of supervision to discover and guard against unknown danger.
 
 
 40
 For these reasons we think Plan OU-8 was properly excluded from the evidence.
 
 
 41
 Since the defendants were not the actors who caused the harm and there appears pears no basis for charging them with King's fault, the judgment below will be affirmed.
 
 
 42
 Affirmed.
 
 
 43
 SOPER, Circuit Judge (dissenting).
 
 
 44
 There is little difficulty in this case if one accepts the testimony at its face value and does not permit it to be overshadowed by the relationship of independent contractor that existed between King and Phillips. There is no doubt that King committed an unlawful act when he entered upon the land of the United States and appropriated the soil without the Government's permission. It is true that he had the permission of the South Carolina Public Service Authority (Santee Cooper) but that body had only an easement or right-of-way while the United States owned the fee. King took no pains to discover the identity of the true owner, as he was bound to do, and consequently he was a trespasser ab initio and liable for the injuries caused by his negligence in the performance of a tortious act.
 
 
 45
 King's liability was admitted in the argument of this appeal and it is in effect conceded by the opinion of this court, for otherwise the extended discussion designed to show that Phillips was not responsible for King's act would have been entirely useless and vain. The real question for decision is whether Phillips consented to and participated in king's unlawful act, for it goes without saying that if he did, he is not excused on the ground that King had the status of an independent contractor.
 
 
 46
 King gave the testimony set out in the following questions and answers with respect to the point in issue:
 
 
 47
 'Q. When it came to getting dirt, who did you tell? A. Mr. Covington and Mr. Eubanks,* both together, what I intended to do.
 
 
 48
 'Q. Mr. Covington and Mr. Eubanks? A. Yes and Mr. Covington told me in front of Mr. Eubanks to haul dirt from this place. He didn't care where I got it. I also told him I wasn't going to touch it until I got a letter in writing from Santee Cooper telling me to do it, which I got.'
 
 
 49
 Eubanks testified that he knew that King was getting the dirt from the right-of-way and putting it in place in the performance of his contract in the housing project. Hence it is plain that Phillips had prior knowledge of King's act and expressly consented thereto and accepted the fruits thereof. Under these circumstances Phillips' conduct cannot be excused on the ground that it consisted merely of the casual receipt of information in which he had no interest. Nor can it be fairly said that in Phillips' conduct-- 'There was nothing approaching a command or an instruction or even a suggestion. There was no meddling, no exercise of control'. Participation in the trespass was shown by Phillips' prior knowledge, consent, and acceptance. The case falls clearly within the rule well expressed in the following passage from Ketchum v. Newman, 141 N.Y. 205, 36 N.E. 197, 198:
 
 
 50
 'Where a trespass has been committed upon the rights or property of another, by the advice or direction of a defendant, it is wholly unimportant what contractual or other relation existed between the immediate agent of the wrong and the person sought to be charged. The latter cannot shelter himself under the plea that the immediate wrongdoer did the act in execution of a contract, or that he came within the definition of an independent contractor as to the performance of the work in the execution of which the tortious act was committed. If he advised or directed the act, his liability is established.'
 
 
 
 [1]
 The real defendant appears to be the construction company. It is sometimes subsequently referred to as 'the defendant.'
 
 
 [2]
 Norris v. Bryant, 217 S.C. 389, 60 S.E.2d 844; Rogers v. Florence R. Co., 31 S.C. 378, 9 S.E. 1059; Chatman v. Johnny J. Jones Exposition, Inc., 212 S.C. 215, 47 S.E.2d 302; McDowell v. Stilley Plywood Co., 210 S.C. 173, 41 S.E.2d 872
 
 
 [3]
 Norris v. Bryant, 217 S.C. 389, 60 S.E.2d 844, 850; Cooper v. Graham, 231 S.C. 404, 98 S.e.2d 843
 
 
 [4]
 See, e. g., Jones' Adm'r v. McMinimy, 93 Ky. 471, 20 S.W. 435; Langrell v. Harrington, 42 Del. 547, 41 A.2d 461
 
 
 [5]
 Restatement of the Law, Torts, 413, 416, 427, 519, 520
 
 
 [6]
 Allison v. Ideal Laundry & Cleaners, 215 S.C. 344, 55 S.E.2d 281; Alexander v. Seaboard Air Line R. Co., 221 S.C. 477, 71 S.E.2d 299; and see Conlin v. City Council of Charleston, 15 Rich.L. 201, 49 S.C.Law 15, though the real principle underlying the Conlin case seems to be the landowner's failure to exercise care to remedy a dangerous condition which causes injury to his licensee. In South Carolina, the liability is absolute, the blaster being liable for the damage he causes without regard to the care he exercised to avoid it. Wallace v. A. H Guion & Company Inc., 237 S.C. 349, 117 S.E.2d 359
 
 
 [7]
 Conlin v. City Council of Charleston, 15 Rich.L. 201, 49 S.C.Law 15; Lotocka v. Elevator Supplies Co., 246 N.Y. 295, 158 N.E. 874; De Haen v. Rockwood Sprinkler Co. of Massachusetts, 258 N.Y. 350, 179 N.E. 764
 
 
 [8]
 Restatement of the Law, Torts 318, 877. Restatement of the Law, Agency 2d, 213. See the dictum in Rosenberg v. Schwartz, 260 N.Y. 162, 183 N.E. 282, 283, as to the duty of a general contractor 'who is present and sees and realizes that a subcontractor is doing his work in an unlawful and dangerous manner.'
 
 
 [9]
 See e. g., Brandolino v. Carrig, 312 Mass. 295, 44 N.E.2d 788
 
 
 [10]
 Restatement of the Law, Torts 410
 
 
 [11]
 See, e.g., Hudson v. Gulf Oil Co., 215 N.C. 422, 2 S.E.2d 26; Sabin v. Union Oil Company of California, 150 Cal.App.2d 606, 310 P.2d 685
 
 
 [12]
 See, however, Marshall v. White, Harp. 122, 16 S.C.Law 56; Restatement of the Law, Torts, 162, 157; 52 Am.Jur. 857, Trespass 28
 
 
 [13]
 Weinman v. de Palma, 232 U.S. 571, 34 S.Ct. 370, 58 L.Ed. 733; Stout Lumber Co v. Reynolds, 175 Ark. 988, 1 S.W.2d 77; McDaniel Bros. v. Wilson, Tex.Civ.App., 70 S.W.2d 618; Lexington & E.Ry. Co. v. Breathitt County Board of Education, 176 Ky. 541, 195 S.W. 1094; White River Ry. Co. v. Batesville & Winerva Telephone Co., 81 Ark. 195, 98 S.W. 721; 27 Am.Jur. 518-519, Independent Contractors 40
 
 
 [14]
 27 Am.Jur. 518-519, Independent Contractors 40
 
 
 [15]
 Ketchman v. Newman, 141 N.Y. 205, 36 N.E. 197, 24 L.R.A. 102; Yellow Poplar Lumber Co. v. Adkins, 221 Ky. 794, 299 S.W. 963; Harris v. Stone, 256 Ky. 737, 77 S.W.2d 18
 
 
 [16]
 At the time of the accident, the off-site work had not begun. The time for the coordination of the activities of the two contractors had not arrived. What Phillips was to do was shown in detail on the drawings and specifications furnished him. Plan OU-8 was not shown to have contained nay information which would have assisted him in any of his work prior to the accident
 
 
 [17]
 This proposition was followed and applied in Gardner v. Stonestown Coporation, 145 Cal.App.2d 405, 302 P.2d 674. In Rosenberg and Gardner, respectively, the subcontractor's work on the site created obvious danger to persons using a public sidewalk and to children at play in the play yard of an apartment building. For a more restricted view of the duty of a general contractor who knows a subcontractor is pursuing unlawful and dangerous procedures on the job site, but where exposure to the risk was not so public, see such cases as Trecartin v. Mahony-Troast Const. Co., 18 N.J.Super. 380, 87 A.2d 349, opinion by Judge, now Mr. Justice Brennan, and Bedford v. Bechtel Corporation, 172 Cal.App.2d 401, 342 P.2d 495
 
 
 *
 Covington was the vice-president and general superintendent of Phillips and Eubanks was the field superintendent in charge of this particular contract