1696

Donald SNOW and Judith Snow, Respondents v.
The CITY OF COLUMBIA, Appellant.

(409 S.E. (2d) 797)

Court of Appeals

*H. Ronald Stanley,* Columbia, *for appellant.*

*Robert A. McKenzie* and *S. Bryan Doby,* of *McDonald, McKenzie, Fuller, Rubin & Miller,* Columbia, *for respondents.*

Heard Feb. 18, 1991; Decided Sept. 23, 1991.

Rehearing Denied Oct. 31, 1991.

BELL, Justice:

This is an action in tort for damage to real property. Donald and Judith Snow sued The City of Columbia for damage to their residence caused by the discharge of water from a water main owned and maintained by the City. They alleged causes of action for negligence, trespass, and strict liability. They made no claim for nuisance. The case was tried before a jury. At the close of the evidence, the judge directed a verdict for the City on the negligence claim. He then directed a verdict for the Snows on the trespass and strict liability claims. The jury awarded the Snows $5000.00 in actual damages. The City appeals. We reverse and remand.

The evidence showed the Snows built a house in 1985 at 122

Nursery Ridge Lane near the Town of Irmo, South Carolina. The City of Columbia provides water service to the subdivision in which the house is located.

On January 11, 1987, the Snows discovered water standing in their basement. Further investigation disclosed water was seeping through a crack in the foundation wall of the house. A few days later, Mr. Snow found water bubbling from the ground near his water meter. He reported the problem to the City. A City maintenance crew came and excavated about eight feet of earth at the point where the City's water main joined a lateral connecting pipe. They discovered water flowing from a flange joint fastened by a series of nuts and bolts. Several bolts were loose and had to be tightened. When tightening them failed to stop the leak, the maintenance crew placed a sleeve over the joint. The sleeve stopped the leak.

The City stipulated it owns and maintains the water line. It also stipulated water from the line intruded on the Snows' property. An expert witness for the Snows testified that water from the City's main built up pressure on the front side of their house, cracking a construction joint in the foundation wall and coming into their basement. The evidence also established the Snows suffered out of pocket damages of at least $4740.00 for repairs to the foundation wall and damage to their lawn and shrubbery. Mr. Snow testified visible cracks on the interior of the wall and other signs of water damage in the basement diminished the fair market value of the house by $5000.00 to $10,000.00. The City introduced no evidence.

## I.

We first address the claim for strict liability. The Snows assert the City is liable for the damage to their house under the rule in *Rylands v. Fletcher* (1868) L.R. 3 H.L. 330. The rule states that a person who for his own purposes brings on his lands and collects or keeps there anything likely to do mischief if it escapes must keep it at his peril, and if it escapes he is liable for damage caused to another which is the natural consequence of its escape.[1] In *Rylands*, a mill

---

[1] This statement of the rule is taken from the opinion of Blackburn, J., in the Exchequer Chamber. *See Fletcher v. Rylands* (1866) L.R. 1 Ex. 265, 279. It is generally regarded as the classic formulation of the rule. The House of Lords affirmed the decision and the reasoning of the Exchequer Chamber. Lord

owner was held liable when water he collected in a reservoir built on his land burst through a series of old mineshafts leading from the reservoir to his neighbor's lands, flooding the neighbor's mines. The court saw no evidence that the mill owner acted other than in a careful and competent manner in collecting the water in the reservoir. He was liable merely because the water escaped to his neighbor's property causing damage thereto.

The rule in *Rylands v. Fletcher* forms no part of the common law of South Carolina. The decision of our Supreme Court in *Allison v. Ideal Laundry & Cleaners*, 215 S.C. 344, 55 S.E. (2d) 281 (1949), repudiates the rule. In *Allison*, the owner of a commercial laundry kept a large tank of propane gas on his land for the purpose of firing his boilers. Through no fault on the owner's part, gas escaped from the tank into the surrounding neighborhood. The escaped gas ignited, causing a catastrophic explosion which destroyed the plaintiff's house. The Court rejected the argument that the owner was strictly liable for the damage irrespective of negligence on his part. Since the owner had exercised reasonable precaution in storing the gas on his property and its escape resulted from no lack of due care on his part, the Court held him not liable to the plaintiff. The Court further concluded the use of propane gas for fuel was not an inherently dangerous activity that would remove the case from the normal rule of no liability without fault.

The Court's refusal to embrace the rule in *Rylands v. Fletcher* is supported by sound reasons. The risk of harm is an inescapable fact of human life. When a person seeks a remedy at law for some harm that befalls him, the court must decide among several possible responses. It may let the loss lie where it falls, leaving the injured person with no legal rem-

Cranworth stated: "If a person brings, or accumulates, on his land anything which, if it should escape, may cause damage to his neighbour, he does so at his peril. If it does escape, and cause damage, he is responsible, however careful he may have been, and whatever precautions he may have taken to prevent the damage." *Rylands v. Fletcher, supra*, at 340. Lord Cairns observed that the rule applied because the defendants, for their own purposes, had made a "non-natural" use of their land. He distinguished cases involving water naturally present on land. *Id.*, at 338-339. Although the decision drew on existing precedents such as *Tenant v. Godwin* (1703) 2 Ld. Raymn. 1089, it recognized a new rule of liability broader than any which preceded it. *See* J. Jolowicz and T. Lewis, WINFIELD ON TORT, 8th ed., 411-412 (1967).

edy. On the other hand, it may allocate the loss to another person according to some principle of liability. If the parties have already allocated the risk of a particular harm by agreement (private choice), the court may simply enforce the agreement. In that case, liability arises in contract. If the risk has been allocated by legislation (political choice), the court will enforce the legislation. Liability arises by statute. If the court itself must allocate the loss (adjudication), it has a range of legal theories upon which relief may be granted. The court may determine that the act of one party or another caused the harm and allocate the loss on the basis of causation alone. If the act of a party both caused the harm and was an unjustified act, the court may allocate the loss on the basis of fault. It may also conceivably allocate the loss to a party who neither directly caused the loss nor acted in an unjustified manner, but who is in a "better" position to bear the loss than the injured party. In all of these cases, liability is said to arise in tort by operation of law.

At common law, tort liability has primarily been grounded not on the notion that the defendant by his *mere* act or omission has caused harm to the plaintiff, but rather on the notion that the defendant by his *wrongful* act or omission has caused harm to the plaintiff. The root idea of tort law is that the defendant must be "in the wrong," "at fault," "unjustified," "blameworthy," or "culpable" for liability to attach to his conduct.

This idea, which we shall call the fault principle, underlies civil liability from the early history of the common law to modern times.[2] It is reflected in the very words the law has chosen

---

[2] The view that the early law imposed absolute liability on one who caused harm to another has been questioned by more recent historical scholarship. This view, popularized by such writers as Wigmore and Prosser, holds the "primitive" common law required a man to make good any damage he inflicted on another without regard to moral blame on his part; only in the nineteenth century, did the law adopt a principle of "no liability without fault." According to Prosser, this "nineteenth century" view has, in turn, been overthrown by the rise of the modern law of strict liability based on "new reasons of social policy." This account of the "primitive" law rests largely on the lack of early cases in which accident (no fault) was pleaded as a special defense. It ignores, however, the wealth of cases in which the defendant's freedom from

to denote the nature of this liability—tort (law French), transgressio (Latin), trespass (English)—all of which mean "wrong."[3] It is manifested in the language by which the defendant pleaded the general issue in the early law: *in nullo est inde culpabilis*—"in no way is he at fault." Fault remains a foundational principle of tort liability today. In the words of our Supreme Court, "There is no tenet more fundamental in our law than liability follows the tortious wrongdoer." *Fitzer v. Greater Greenville South Carolina Young Men's Christian Assoc.*, 277 S.C. 1, 3, 282 S.E. (2d) 230, 231 (1981).

The extent to which the common law recognizes liability without fault is quite limited. Traditionally, "no fault" or "strict" liability was confined to a few narrowly defined categories such as cattle trespass, public callings, certain

---

blame was put in issue by pleas of justification. It also overlooks technicalities of medieval pleading that forced the defendant to plead the general issue rather than special matter if his defense was accident or lack of negligence. It seems defendants could and did obtain acquittal under the general issue by proving to the jury that they were not at fault. Supporters of a "primitive" law of strict liability have often fallen into the error of assuming that forms of pleading reflected substantive principles of liability in the medieval law. Our knowledge of medieval modes of legal reasoning, the early writ system, and the development of common law rules of pleading suggest this assumption is false. *See* J. Wigmore, *Responsibility for Tortious Acts: Its History*, in 3 SELECT ESSAYS IN ANGLO-AMERICAN LEGAL HISTORY, 474 (1909); W. Prosser, THE LAW OF TORTS, 4th ed., 17-19, 492-496 (1971); O. Holmes, THE COMMON LAW, 2-5, 88-107, 144-163 (1881); N. Isaacs, *Fault and Liability*, 31 HARV.L.REV. 954, 966 (1918); P. Winfield, *The Myth of Absolute Liability*, 42 L.Q.R. 37 (1926); C. Gregory, *Trespass to Negligence to Absolute Liability*, 37 VA.L.REV. 359 (1951); S. Milsom, *Trespass From Henry III to Edward III*, 74 L.Q.R. 195-224, 407-436, 561-590 (1958); W. Malone, *Ruminations on the Role of Fault in the History of the Common Law*, 31 LA.L.REV. 1 (1970); S. Milsom, HISTORICAL FOUNDATIONS OF THE COMMON LAW, 2d ed., 285-313, 392-400 (1981); M. Arnold, SELECT CASES OF TRESPASS FROM THE KING'S COURTS, 1307-1399, Volume I (100 Selden Soc.), xxix-xxxi, xlii-xliii (1985).

[3] The word "trespass" in medieval usage referred to wrongdoing in the general sense (as in "forgive us our trespasses as we forgive those who trespass against us"), not to the later nominate tort of trespass consisting of intentional and direct injury to lands, goods, or the person. *See* Milsom, HISTORICAL FOUNDATIONS, *supra*, at 285; Arnold, SELECT CASES OF TRESPASS, *supra*, at I: ix-x.

kinds of nuisance, and so-called ultrahazardous activities.[4] In the nineteenth century, the English courts added two general exceptions to fault based liability: the rule in *Rylands v. Fletcher* and the modern doctrine of *respondeat superior* which imposes liability on a master for the wrongdoing of his servant even though the master himself is not at fault. *See South Carolina Insurance Co. v. James C. Green, Inc.*, 290 S.C. 171, 178-183, 348 S.E. (2d) 617, 621-624 (Ct. App. 1986).

Underlying these exceptions to the fault principle is a perception that as between two parties, neither of whom is at fault, the loss should be borne by the one who benefits from the enterprise that leads to the harm and who is in a better position to spread the risk of the harm. *Id.* This concept of enterprise liability introduces an alternative to the fault principle based on the concept of risk spreading rather than wrongdoing. In effect, it makes the person engaged in an enterprise an insurer against harm which results therefrom without regard to fault on his part. This idea, which we shall call the insurance principle,[5] is a departure from fault based liability. Generally, the common law does not make a person an insurer

---

[4] *See Newson v. Axon*, 12 S.C.L. (1 McC.) 208 (1821); *Cook v. Gourdin*, 11 S.C.L. (2 Nott & McC.) 8 (1819); *Frost v. Berkeley Phosphate Co.*, 42 S.C. 402, 20 S.E. 280 (1894); *Wallace v. A.H. Guion & Co.*, 237 S.C. 349, 117 S.E. (2d) 359 (1960). South Carolina has never recognized the English common law rule of strict liability for cattle trespass. Since 1881, cattle trespass has been governed by statute. Our Supreme Court has construed the statute to incorporate a standard of due care rather than strict liability. *See Ellis v. Loftus Iron Co.* (1874) L.R. 10 C.P. 10; *Lee v. Riley*, (1865) 18 C.B. (N.S.) 722; Act No. 472, Acts and Joint Resolutions of the General Assembly of South Carolina, 1881, 17 STAT. 591 [codified as S.C. Code Ann. 47-7-110, et seq. (1976)]; *Kirby v. Mathis*, 89 S.C. 252, 71 S.E. 862 (1911). Strict liability for defective products also has been introduced by statute in South Carolina. *See* Section 15-73-10, Code of Laws of South Carolina, 1976, as amended. The common law of this State does not recognize strict product liability. *Hatfield v. Atlas Enterprises, Inc.*, 274 S.C. 247, 262 S.E. (2d) 900 (1980). For a discussion of the origins of the modern doctrine of products liability see G. Priest, *The Invention of Enterprise Liability: A Critical History of the Intellectual Foundations of Modern Tort Law;* 14 J. OF LEGAL STUDIES 461 (1985).

[5] The idea that strict liability rests on a duty to insure as opposed to a duty to exercise caution was popularized by Sir Frederick Pollock in his seminal work, THE LAW OF TORTS: A TREATISE ON THE PRINCIPLES OF OBLIGATIONS ARISING FROM CIVIL WRONGS IN THE COMMON LAW (1887). Chapter XII, dealing with the rule in *Rylands v. Fletcher* and other rules of strict liability, is entitled "Duties of Insuring Safety." *Id.*, at 393. Hence we use the term "insurance principle" to describe the idea underlying strict tort liability.

against all harm that may result from his conduct. *See Carter v. R.L. Jordan Oil Co., Inc.*, 294 S.C. 435, 365 S.E. (2d) 324 (Ct. App. 1988), *reversed on other grounds*, 299 S.C. 439, 385 S.E. (2d) 820 (1989).

The common law has been hesitant to embrace the insurance principle for good reasons. For one thing, no fault liability sometimes permits the injured party to recover even though he has failed to exercise reasonable care for his own welfare. *See, e.g., Austin v. Lincoln Equipment Associates, Inc.*, 888 F. (2d) 934 (1st Cir. 1989); *McCown v. International Harvester, Co.*, 463 Pa. 13, 342 A. (2d) 381 (1975). This result conflicts with generally accepted notions of fairness and responsibility. For another, the insurance principle has inherent limitations that make it unsuitable as a general ground of legal liability.

In many, if not most cases, both parties, not one, benefit from the enterprise that occasions the injury. Thus, it is difficult to justify the rule on the ground that the loss is being allocated to the person who benefits from conducting the enterprise. The present case is a good example. Operating and maintaining a municipal water system is arguably of much greater benefit to private property owners such as the Snows than it is to the City. If the risk of loss ought be allocated to the party who benefits from the enterprise, the insurance principle does not easily fit a case like this one.

Similarly, in many cases the assumption that the party conducting the enterprise possesses the ability to spread risk over a large pool of third parties is simply not true. For example, if the enterprise is conducted by a small business or municipality, the extent to which it can spread the risk may be quite limited. In such instances, the justification for allocating the loss through the insurance principle is weakened.

Additionally, just as it is impossible to avoid all harm in the conduct of human affairs, it is impossible to insure against all harm. At some point the marginal cost of insuring against risks becomes greater than the marginal benefit of conducting the enterprise that gives risk to those risks. Given the complexity of human activity, this threshold is difficult to establish by legal rules of general application; often it may be much lower than expected for particular activities. As a result, imposition of no fault liability, though a well meaning attempt to

compensate an injured party, may give rise to unintended consequences, including the refusal of people or public bodies to engage in highly desirable activities.

To summarize, the initial inclination of the common law is to leave losses where they fall. This approach favors such values as personal autonomy and liberty of human action. If, however, a loss is caused by conduct which is wrongful, the common law will apply the fault principle to place the loss on the at fault party. If fault is not involved, the common law ordinarily leaves the shifting of risk to private agreement or statute. This makes sense because the imposition of no fault liability involves issues of utility better resolved by individuals, the free market, or the legislature than by courts, which are ill placed to make judgments about individual and social utility and are not accountable to the discipline of the market or the political process.

## II.

We next turn to the trespass cause of action. The Snows contend trespass lies in all cases where the act complained of is the immediate and direct cause of the intrusion on the land without regard to the defendant's intent. In their words, "A mere unintentional trespass subjects the intruder to liability for actual damages suffered by the owner." This contention rests on a mistaken view of the law of trespass to land.

At common law, all land held in peaceable possession is deemed to be enclosed. *Harris v. Baden*, 154 Fla. 373, 17 So. (2d) 608 (1944). Subject to limited exceptions not relevant to this case, the person in peaceable possession has the right to exclude all others from the enclosure. *See Stratos v. King*, 282 S.C. 501, 319 S.E. (2d) 356 (Ct. App. 1984). The unwarrantable entry on land in the peaceable possession of another is a trespass, without regard to the degree of force used, the means by which the enclosure is broken, or the extent of the damage inflicted. *Lee v. Stewart*, 218 N.C. 287, 10 S.E. (2d) 804 (1940). The entry itself is the wrong. Thus, for example, if one without license from the person in possession of land walks upon it, or casts a twig upon it, or pours a bucket of water upon it, he commits a trespass by the very act of breaking the enclosure. *See Moore v. Duke*, 84 Vt. 401, 80 A. 194 (1911); 1 G. Addison, A TREATISE ON THE LAW OF

TORTS, 388 (Wood ed. 1881); Restatement 2d of Torts, 158, comment i, illustration 3 (1965). It is immaterial whether any further damage results. *See Brown Jug, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 959*, 688 P. (2d) 932 (Alaska 1984). The mere entry entitles the party in possession at least to nominal damages. *Lee v. Stewart, supra.* To constitute an actionable trespass, however, there must be an affirmative act, the invasion of the land must be intentional, and the harm caused must be the direct result of that invasion. *Alabama Power Co. v. C.G. Thompson*, 278 Ala. 367, 178 So. (2d) 525 (1965). Trespass does not lie for nonfeasance or failure to perform a duty. *Id.*

Intent is proved by showing that the defendant acted voluntarily and that he knew or should have known the result would follow from this act. *Snakenberg v. Hartford Casualty Insurance Co.*, 299 S.C. 164, 383 S.E. (2d) 2 (Ct. App. 1989). Although neither deliberation, purpose, motive, nor malice are necessary elements of intent, the defendant must intend the act which in law constitutes the invasion of the plaintiff's right. *Id.* Trespass is an intentional tort; and while the trespasser, to be liable, need not intend or expect the damaging consequence of his entry, he must intend the act which constitutes the unwarranted entry on another's land. *See Phillips v. Sun Oil Co.*, 307 N.Y. 328, 121 N.E. (2d) 249 (1954); *Lee v. Stewart, supra* (it is immaterial whether defendant in committing the trespass actually contemplated the resulting damage to plaintiff).[6]

---

[6] The cases relied upon by the Snows are in accord with the rule stated. In each of those cases, the defendant physically entered and conducted activity on land to which the plaintiff claimed title. In each case the entry was manifestly an intentional act. *See Ingleside Manufacturing Co. v. Charleston Light and Water Co.*, 76 S.C. 95, 56 S.E. 664 (1907); *Baldwin v. Postal Telegraph Cable Co.*, 78 S.C. 419, 59 S.E. 67 (1907); *Wood v. Pacolet Manufacturing Co.*, 80 S.C. 47, 61 S.E. 95 (1908); *Woodstock Hardwood and Spool Manufacturing Co. v. Charleston Light and Water Co.*, 84 S.C. 306, 66 S.E. 194 (1909). The issue in *Baldwin* and *Wood* was whether the damage was inflicted willfully. In both cases, the Court used the phrase "unintentional trespass." Taken in context, the Court used "unintentional" to draw a contrast to "wilful." It said only that the plaintiff need not prove the defendant was wilful or negligent to recover damages. As used by the Court, "unintentional" meant the defendant did not intend the damage flowing from the entry on the land, not that the entry itself was an unintentional act.

In this case, the immediate cause of the entry on the Snows' land was the discharge of water from the leaking pipe joint. However, the City did not intentionally discharge the water. In fact, the City was not aware of the leak until Mr. Snow brought it to their attention. The Snows make no claim to the contrary. Mr. Snow himself testified that the City did *not* intentionally allow the water to escape onto his property. At best, the evidence showed the leak resulted from the City's inadvertent failure to keep its water main in good operating condition. Since the event which constituted the entry was not a voluntary act of the City, an action for trespass will not lie. To hold otherwise on the facts before us would effectively impose strict liability under the guise of trespass to land.

## III.

Finally, the Snows argue that the circuit court erred in directing a verdict against them on their negligence claim. They contend that the City presented no evidence to refute their testimony of negligence and that the only inference to be drawn from the evidence is that the City was negligent as a matter of law.

A cause of action for negligence arises from the concurrence of three essential elements: (1) a duty of care owed by the defendant to the plaintiff; (2) the defendant's breach of that duty by a negligent act or omission, i.e., failure to exercise the care of a reasonable man in the circumstances; and (3) damage proximately resulting from the breach of duty. *South Carolina Insurance Co. v. James C. Greene, Inc.*, 290 S.C. 171, 176, 348 S.E. (2d) 617, 620 (Ct. App. 1986). The duty of care is that standard of conduct the law requires of an actor in order to protect others against the risk of harm from his actions. It embodies the principle that the plaintiff should not be called to suffer a harm to his person or property which is foreseeable and which can be avoided by the defendant's exercise of reasonable care. *Carolina Winds Owners' Association, Inc. v. Joe Harden Builder, Inc.*, 297 S.C. 74, 374 S.E. (2d) 897 (Ct. App. 1988), *cert. dismissed*, Order No. 89-OR-229 (filed February 27, 1989), questioned on other grounds, *Kennedy v. Columbia Lumber Co., Inc.*, 299 S.C. 335, 384 S.E. (2d) 730 (1989), *overruled in part on other grounds, Beachwalk Villas Condo-*

*minium Assoc. v. Martin,* — S.C. —, 406 S.E. (2d) 372 (1991) 406 S.E. (2d) at 374.

The plaintiff has the burden of proving each element of negligence, including the defendant's lack of due care. *See South Carolina State Ports Authority v. Booz-Allen & Hamilton,* 289 S.C. 373, 346 S.E. (2d) 324 (1986); *Carter v. Columbia Gas & Railway Co.,* 19 S.C. 20 (1883). This burden of proof cannot be met by relying on the theory that the thing speaks for itself or that the very fact of injury indicates a failure to exercise reasonable care. *King v. J.C. Penney Co.,* 238 S.C. 336, 120 S.E. (2d) 229 (1961); *Gilland v. Peter's Dry Cleaning Co.,* 195 S.C. 417, 11 S.E. (2d) 857 (1940). No inference of negligence arises from the mere fact of injury. *Covington v. Atlantic Coast Line Railway Co.,* 158 S.C. 194, 155 S.E. 438 (1930), *cert. denied,* 282 U.S. 858, 51 S. Ct. 33, 75 L. Ed. 759 (1930).[7] The defendant is not required to present evidence to refute the plaintiff's allegations; he may elect to put the plaintiff to strict proof of all the elements of his cause of action. *See, Carter v. Columbia Gas & Railway Co., supra.*

Upon reviewing the record, we conclude the Snows have not shown, to the exclusion of all other reasonable inferences, that the City ought to have known about and repaired the leaking pipe joint before Mr. Snow reported a problem. Moreover, there is no evidence of any neglect of the City to perform a reasonable program of maintenance on its water mains. The Snows also failed to establish why the flange joint leaked. For these reasons, we cannot hold the City was negligent as a matter of law.

On the other hand, the Snows have shown more than the mere fact of damage to their property from the leaking water main. There was testimony that the bolts on the flange joint needed tightening when the City's maintenance crew located the leak. The mere tightening of the bolts did not, however, stop the leak. From these facts competing inferences might reasonably be drawn as to the City's failure to exercise due

---

[7] South Carolina does not recognize the rule of *res ipsa loquitur. Crider v. Infinger Transportation Co.,* 248 S.C. 10, 148 S.E. (2d) 732 (1966). In an action for negligence, the plaintiff must prove by direct or circumstantial evidence that the defendant did not exercise reasonable care. South Carolina's rejection of *res ipsa loquitur* is consistent with its general adherence to fault based liability in tort. It also comports with the normal rules of proof, which require the plaintiff to prove affirmatively each element of his cause of action.

care in the installation and maintenance of the water main and as to the issue of proximate causation. Because the significance of these facts and inferences to be drawn from them were in dispute, the issue of negligence was for the jury. *Cf., Davis v. Piedmont Engineers*, 284 S.C. 20, 324 S.E. (2d) 325 (Ct. App. 1984). Therefore, the circuit court erred in directing a verdict for the City on the negligence cause of action.

For the reasons stated, we reverse the judgment of the circuit court and remand the case for a new trial solely on the cause of action for negligence.

Reversed and remanded.

GARDNER, J., and LITTLEJOHN, A.J., concur.

