Oluf JOHNSON, et al., Respondents,

v.

**PAYNESVILLE FARMERS UNION COOPERATIVE OIL COMPANY, Appellant.**

Nos. A10–1596, A10–2135.

Supreme Court of Minnesota.

Aug. 1, 2012.

Arlo H. Vande Vegte, Arlo H. Vande Vegte, P.A., Plymouth, MN; and Harry Burns, Burns Law Office, Saint Cloud, MN, for respondents.

Kevin F. Gray, Matthew W. Moehrle, Rajkowski Hansmeier, Ltd., Saint Cloud, MN, for appellant.

Jonathan C. Miesen, Margaret E. Dalton, Stoel Rives LLP, Minneapolis, MN, for amici curiae Minnesota Grain and Feed Association, Cooperative Network, and Minnesota Statewide Cooperative Managers Association.

## OPINION

GILDEA, Chief Justice.

This action involves alleged pesticide contamination of organic farm fields in central Minnesota. Appellant Paynesville Farmers Union Cooperative Oil Company ("Cooperative") is a member owned farm products and services provider that, among other things, applies pesticides to farm fields. Respondents Oluf and Debra Johnson ("Johnsons") are organic farmers. The Johnsons claim that while the Cooperative was spraying pesticide onto conventionally farmed fields adjacent to the Johnsons' fields, some pesticide drifted onto and contaminated the Johnsons' organic fields. The Johnsons sued the Cooperative on theories including trespass, nuisance, and negligence per se and sought damages and injunctive relief. The Johnsons claim that the pesticide drift caused them: (1) economic damages because they had to take the contaminated fields out of organic production for 3 years pursuant to 7 C.F.R. § 205.202(b) (2012), (2) economic damages because they had to destroy some crops, (3) inconvenience, and (4) adverse health effects. The district court granted summary judgment to the Cooperative and dismissed all of the Johnsons' claims. The court of appeals reversed. Because we conclude that the Johnsons' trespass claim and claims for damages based on 7 C.F.R. § 205.202(b), fail as a matter of law, we reverse the court of appeals' reinstatement of those claims. But because the district court failed to consider whether the Johnsons' non trespass claims that were not based on 7 C.F.R. § 205.202(b), could sur-

vive summary judgment, we affirm the court of appeals' reinstatement of those claims and remand for proceedings consistent with this opinion.

Before discussing the factual background of this case, it is helpful to briefly summarize the organic farming regulations at issue. American organic farming is regulated by the Organic Foods Production Act of 1990, 7 U.S.C. §§ 6501–6523 (2006) ("OFPA"), and the associated federal regulations in the National Organic Program, 7 C.F.R. § 205 (2012) ("NOP"). One of the purposes of the OFPA is "to establish national standards governing the marketing of certain agricultural products as organically produced products." 7 U.S.C. § 6501(1). The states may adopt the federal standards or they may impose "more restrictive requirements governing" products sold as organic. 7 U.S.C. § 6507(b)(1). Minnesota has adopted the OFPA and the NOP as its state organic farming law. Minn.Stat. § 31.925 (2010) (adopting the OFPA and the NOP "as the organic food production law and rules in this state").

Under the OFPA and the NOP regulations, a producer cannot market its crops as "organic," and receive the premium price paid for organic products, unless the producer is "certified" by an organic certifying agent. 7 U.S.C. § 6503(d) (stating that the OFPA is implemented by certifying agents authorized through the Secretary of Agriculture); 7 C.F.R. §§ 205.100, .102 (describing which products can carry the "organic" label). And in order to receive certification, a producer must comply with the NOP. 7 C.F.R. § 205.400. Among numerous other requirements, the NOP provides that land from which crops are intended to be sold as organic must "[h]ave had no prohibited substances ... applied to it for a period of 3 years immediately preceding harvest of the crop." 7 C.F.R. § 205.202(b).[1]

Once producers obtain certification to sell products as organic, the OFPA and NOP provide guidelines for certified organic farming operations to ensure continued compliance. *See* 7 U.S.C. § 6511. Under these guidelines, if a prohibited substance is detected on a product sold or labeled as organic, the certifying agent must conduct an investigation to determine whether there has been a violation of the federal requirements. *See* 7 U.S.C. § 6511(c)(1). If the investigation indicates that the residue detected on the organic product was "the result of intentional application of a prohibited substance" or the residue is "present at levels that are greater than" federal regulations prescribe, the product cannot be sold as organic. 7 U.S.C. § 6511(c)(2). Under the NOP regulations, crops may not be sold as organic if the crops are shown to have a prohibited substance on them at levels that are greater than 5 percent of the Environmental Protection Agency's tolerance level for that substance. 7 C.F.R. § 205.671

With this regulatory scheme in mind, we turn to the incidents that gave rise to this lawsuit.

In June 2007, the Johnsons filed a complaint with the Minnesota Department of Agriculture ("MDA"), alleging that the Cooperative had contaminated one of their transitional soybean fields[2] through pesticide drift. The subsequent MDA investigation verified that on June 15, 2007, a date when winds were blowing toward the

---

1. The parties agree that the pesticides the Cooperative sprayed are "prohibited substances" under the NOP.

2. A transitional field is one onto which prohibited substances are no longer being applied but has not yet been certified as organic. *See* 7 C.F.R. § 205.202.

Johnsons' fields at 9 to 21 miles per hour, the Cooperative sprayed Status (diflufenzopyr and dicamba) and Roundup Original (glyphosate) onto a conventional farmer's field immediately adjacent to one of the Johnsons' transitional soybean fields. The MDA informed the Johnsons that there was no tolerance for diflufenzopyr in soybeans (organic, transitional, or conventional) and that, pending chemical testing, the MDA would "determine if there [would] be any harvest prohibitions" on the Johnsons' soybeans. After receiving the results of the chemical testing, the MDA informed the parties that test results revealed that the chemical dicamba was present, but below detection levels. The MDA also reported that the chemicals diflufenzopyr and glyphosate were not present. Because only one of the three chemicals was present based on its testing, the MDA concluded that "it can not be proven if the detections were from drift." And even though the testing did not find diflufenzopyr, the MDA still required that the Johnsons plow down a small portion of the soybeans growing in the field because of "the presence of dicamba" and based on the "visual damage" observed to this crop. In response to this MDA directive, the Johnsons destroyed approximately 10 acres of their soybean crop.

The Johnsons also reported the alleged pesticide drift to their organic certifying agent, the Organic Crop Improvement Association (OCIA), as they were required to do under the NOP. *See* 7 C.F.R. § 205.400(f)(1). In an August 27, 2007 letter, the OCIA stated that there may have been chemical drift onto a transitional soybean field and that chemical testing was being done. The Johnsons were also told that "[i]f the analysis indicate[d] contamination," they would have to "take this land back to the beginning of 36–month transition." Based on the OCIA's letter, and the dicamba found by the MDA, the

Johnsons took the transitional soybean field back to the beginning of the 3–year transition process. In other words, the Johnsons did not market soybeans harvested from this field as organic for an additional 3 years.

On July 3, 2008, the Johnsons reported another incident of alleged contamination to the MDA. In this report, the Johnsons alleged that there was pesticide drift onto one of their transitional alfalfa fields after the Cooperative applied Roundup Power Max and Select Max (containing the chemicals glyphosate and clethodium) to a neighboring conventional farmer's field. The MDA investigator did not observe any plant injury, but chemical testing revealed a minimal amount of glyphosate in the Johnsons' transitional alfalfa. The Johnsons reported another incident of drift on August 1, 2008. The MDA "did not observe any plant injury to the alfalfa field or plants, grass and weeds," but chemical testing revealed the presence, at minimal levels, of chloropyrifos, the active ingredient in another pesticide, Lorsban Advanced. The MDA concluded that drift from the Cooperative's spraying caused both of the positive test results. After receiving these test results, the Johnsons took the affected alfalfa field out of organic production for an additional 3 years. The Johnsons took this action because they believed that the presence of any amount of pesticide on their organic fields prohibited them from selling crops harvested from these fields as organic.

Based on the presence of pesticides in their fields, the Johnsons filed this lawsuit against the Cooperative, alleging trespass, nuisance, negligence per se, and battery. They sought damages and a permanent injunction prohibiting the Cooperative from spraying pesticides within a half mile

of the Johnsons' fields.[3] The Johnsons claimed the following types of damages: (1) loss of profits because they had to take the fields onto which pesticide drifted out of organic production for 3 years; (2) loss of profits because they had to destroy approximately 10 acres of soybeans; (3) inconvenience due to increased weeding, pollution remediation, and NOP reporting responsibilities; and (4) adverse health effects.

The district court granted, in part, the Johnsons' motion for a temporary injunction on June 26, 2009, requiring the Cooperative to give the Johnsons notice before it sprayed pesticides on land adjoining the Johnsons' organic farm. Subsequently, the Cooperative moved for summary judgment, and the Johnsons moved to amend their complaint to include claims based on the two 2008 incidents and a claim for punitive damages. After a hearing, the district court granted the Cooperative summary judgment on all of the Johnsons' claims, denied the Johnsons' motion to amend, and vacated the temporary injunction.[4]

The district court concluded that the Johnsons' trespass claim failed as a matter of law, relying on the court of appeals decision in *Wendinger v. Forst Farms,*

*Inc.,* 662 N.W.2d 546, 550 (Minn.App.2003), which held that Minnesota does not recognize trespass by particulate matter.[5] The district court also concluded that all of the Johnsons' negligence per se and nuisance claims failed as a matter of law because the Johnsons lacked evidence of damages. This determination was based on the court's conclusion that because there was no evidence that any chemical on the Johnsons' crops exceeded the 5 percent tolerance level in 7 C.F.R. § 205.671, the Johnsons could have sold their crops as organic and therefore the Johnsons did not prove damages. Because the Johnsons did not have any "evidence of damages based on the NOP regulations," the court concluded that all of the Johnsons' claims must be dismissed and the temporary injunction vacated. And because the court concluded that the Johnsons' claims arising from the 2008 incidents would necessarily fail as a matter of law under the same analysis, the court denied the Johnsons' motion to amend their complaint to include claims based on the 2008 incidents.

The court of appeals reversed and remanded. *Johnson v. Paynesville Farmers Union Coop. Oil Co.,* 802 N.W.2d 383 (Minn.App.2011). As to the trespass claim, the court of appeals concluded that

---

**3.** The complaint included claims based on an incident from 2005 and the June 2007 incident described above. In their proposed amended complaint, the Johnsons sought to add claims based on the two 2008 incidents described above. The district court dismissed the Johnsons' 2005 claims under Minn.Stat. § 541.07(7) (2010), which provides a 2–year statute of limitations for claims "against the person who applies [a] pesticide for injury or damage to property resulting from the application." The court also dismissed the Johnsons' battery claims for lack of evidence of intent. The Johnsons did not appeal these determinations.

**4.** While the court of appeals expressly reversed the district court's denial of the John-

sons' claim for a permanent injunction, it did not reinstate the temporary injunction. *Johnson v. Paynesville Farmers Union Coop. Oil Co.,* 802 N.W.2d 383, 392 (Minn.App.2011). The Johnsons did not appeal the court of appeals' decision on the temporary injunction.

**5.** The district court defined "particulate matter" as " '[m]aterial suspended in the air in the form of minute solid particles or liquid droplets, especially when considered as an atmospheric pollutant.' " (Quoting *The American Heritage Dictionary of the English Language* 1282 (4th ed.2000)). For purposes of this opinion, we use the same definition.

the district court "read too much into" *Wendinger. Id.* at 387. The court of appeals stated that its decision in *Wendinger* should not be read "to define a unique category of physical substances that can never constitute a trespass." *Id.* at 388. Instead of focusing on the intangible nature of pesticide drift, the court of appeals focused on the harm caused by it, stating that pesticide drift will "affect the composition of the land." *Id.* Relying on cases from other jurisdictions that were explicitly distinguished in *Wendinger,* the court of appeals held that pesticide drift "can interfere with possession" and therefore "a trespass action can arise from a chemical pesticide being deposited in [discernible] and consequential amounts onto one agricultural property as the result of errant overspray during application directed at another." *Id.* at 389.

As to the negligence per se and nuisance claims based on 7 C.F.R. § 205.202(b), the court of appeals disagreed with the district court's interpretation of the NOP regulations. *Johnson,* 802 N.W.2d at 390–91. The court of appeals held that the phrase "applied to it" in section 205.202(b) included situations in which pesticides unintentionally came into contact with organic fields. 802 N.W.2d at 390. Based on this conclusion, the court reasoned that the presence of any amount of pesticide on the Johnsons' fields rendered the Johnsons noncompliant with 7 C.F.R. § 205.202(b), and therefore that OCIA had discretion to decertify the Johnsons' fields. 802 N.W.2d at 391 (citing 7 C.F.R. § 205.662(a), (c) (providing that "any noncompliance" with the NOP can lead to decertification)). And because the presence of pesticide on the Johnsons' fields allegedly caused those fields to be decertified, the court of appeals held that the Johnsons had viable claims for damages based on 7 C.F.R. § 205.202(b). 802 N.W.2d at 391. The court of appeals also concluded that the

district court erred in failing to separately analyze or discuss the Johnsons' claims that were not based on trespass or on 7 C.F.R. § 205.202(b), before dismissing all of the Johnsons' claims, and that the district court had abused its discretion in denying the Johnsons' motion to amend their complaint to include claims based on the 2008 incidents. 802 N.W.2d at 391–92.

We granted the Cooperative's petition for review, and on appeal, the Cooperative argues that (1) the Johnsons' trespass claim fails as a matter of law; (2) all of the Johnsons' claims fail as a matter of law because the Johnsons have not shown damages; (3) the district court did not err when it denied the Johnsons' motion to amend their complaint; and (4) the district court did not err when it denied the Johnsons a permanent injunction. We consider each of these issues in turn.

I.

We turn first to the question of whether, as the district court held, the Johnsons' trespass claim fails as a matter of law. The Johnsons assert that the Cooperative trespassed when it sprayed pesticide onto a neighboring conventional field and wind carried the pesticide, as particulate matter, onto the Johnsons' land. The Johnsons contend "that as long as there is damage to the land resulting from deposition of 'particulate matter' a viable claim for trespass exists." The Cooperative argues that the invasion of particulate matter does not, as a matter of law, constitute a trespass in Minnesota. Whether the Johnsons have alleged a viable claim for trespass is a question of law that we review de novo. *See SCI Minn. Funeral Servs., Inc. v. Washburn–McReavy Funeral Corp.,* 795 N.W.2d 855, 865 (Minn.2011) (reviewing de novo whether claimants had alleged the elements of a claim). For the reasons that follow, we conclude that the

conduct about which the Johnsons complain does not constitute a trespass in Minnesota.

We begin with a discussion of the tort of trespass. In Minnesota, a trespass is committed where a plaintiff has the "right of possession" to the land at issue and there is a "wrongful and unlawful entry upon such possession by defendant." *All Am. Foods, Inc. v. Cnty. of Aitkin*, 266 N.W.2d 704, 705 (Minn.1978) (citation omitted); *see generally* 46 Dunnell Minn. Digest *Trespass* § 1.02 (4th ed.2000). Actual damages are not an element of the tort of trespass. *Greenwood v. Evergreen Mines Co.*, 220 Minn. 296, 312, 19 N.W.2d 726, 734–35 (1945). In the absence of actual damages, the trespasser is liable for nominal damages. *Sime v. Jensen*, 213 Minn. 476, 481, 7 N.W.2d 325, 328 (1942); *see also Romans v. Nadler*, 217 Minn. 174, 180–81, 14 N.W.2d 482, 486 (1944) (citing *Whittaker v. Stangvick*, 100 Minn. 386, 111 N.W. 295 (1907)). Finally, because trespass is an intentional tort, reasonableness on the part of the defendant is not a defense to trespass liability. *See H. Christiansen & Sons, Inc. v. City of Duluth*, 225 Minn. 475, 480, 31 N.W.2d 270, 273–74 (1948).

We have not specifically considered the question of whether particulate matter can result in a trespass. The "gist of the tort" of trespass, however, is the "intentional interference with rights of exclusive possession." Dan B. Dobbs, *The Law of Torts* § 50 at 95 (2000); *see also Martin v. Smith*, 214 Minn. 9, 12, 7 N.W.2d 481, 482 (1942) ("The gist of the action of trespass ... is the breaking and entering ... of the plaintiff's close."). In other words, the tort of trespass is committed when a person "intentionally enters or causes direct and tangible entry upon the land in possession of another." Dobbs, *supra*, § 50 at 95 (footnotes omitted). And the defendant's entry must be done "by means of some physical, tangible agency" in order to constitute a trespass. James A. Henderson, Jr. et al., *The Torts Process* 386 (7th ed.2007). Our case law is consistent with this traditional formulation of trespass because we have recognized that a trespass can occur when a person or tangible object enters the plaintiff's land.[6] *See Victor v. Sell*, 301 Minn. 309, 313–14 n. 1, 222 N.W.2d 337, 340 n. 1 (1974) (" 'One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally ... enters land in the possession of the other, or causes a thing or a third person to do so ....' " (quoting with approval the Restatement (Second) of Torts § 158 (1965))); *Greenwood*, 220 Minn. at 311–12, 19 N.W.2d at 734–35 (recognizing that trespass can occur when water floods onto the plaintiff's land); *Whittaker*, 100 Minn. at 391, 111 N.W. at 297 (holding that shotgun pellets that landed on the plaintiff's property could constitute a trespass).[7]

---

**6.** Other jurisdictions similarly recognize that trespass requires invasion by tangible matter. *See, e.g., City of Bristol v. Tilcon Minerals, Inc.*, 284 Conn. 55, 931 A.2d 237, 258 (2007) ("[B]ecause it is the right of the owner in possession to exclusive possession that is protected by an action for trespass, it is generally held that the intrusion of the property be physical and accomplished by tangible matter."); *Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 315 (Iowa 1998) ("Trespass comprehends an actual physical invasion by a tangible matter." (citation omitted)); *Ondovchik Family Ltd. P'ship v. Agency of Transp.*, 187 Vt. 556, 996 A.2d 1179, 1182 (2010) ("[T]respass does not always require personal entry onto land, since a tangible invasion of the[ ] property is enough to make out a prima facie case for trespass." (citation omitted) (internal quotation marks omitted)).

**7.** In *Whittaker*, we also stated, that "[i]t is ... immaterial by means of what instrumentality

When people or tangible objects enter the plaintiff's land without permission, these entries disturb the landowner's right to exclusively possess her land. W. Page Keeton et al., *Prosser & Keeton on the Law of Torts*, § 13, at 70 (5th ed.1984). But the disruption to the landowner's exclusive possessory interest is not the same when the invasion is committed by an intangible agency, such as the particulate matter at issue here. *Id.* § 13, at 71. Such invasions may interfere with the landowner's use and enjoyment of her land, but those invasions do not require that the landowner share possession of her land in the way that invasions by physical objects do. *See Adams v. Cleveland–Cliffs Iron Co.*, 237 Mich.App. 51, 602 N.W.2d 215, 218–19 (1999) ("[P]ossessory rights to real property include as distinct interests the right to exclude and the right to enjoy, violations of which give rise to the distinct causes of action respectively of trespass and nuisance." (citing Keeton, *supra*, § 87)); *John Larkin, Inc. v. Marceau*, 184 Vt. 207, 959 A.2d 551, 555 (2008) (holding that landowner who sprayed pesticide on his land that drifted onto plaintiff's land did not commit trespass because there was no evidence that the pesticide interfered with the plaintiff's right to exclusive possession of his land).

This distinction between inference with possessory rights and interference with use and enjoyment rights is reflected in the only reported decisions in Minnesota, both from the court of appeals, which reached the question of whether an invasion by particulate matter constitutes a trespass. In both cases, the court of appeals held that such invasions do not, as a matter of law, constitute trespass. *Wendinger v. Forst Farms, Inc.*, 662 N.W.2d 546, 550 (Minn.App.2003) (noting that Minnesota "has not recognized trespass by particulate matter" and rejecting a trespass claim because "the odors of which the [plaintiffs] complain interfere with the use and enjoyment of their land, not with their exclusive possession of it"), *rev. denied* (Minn. Aug. 5, 2003); *Fagerlie v. City of Willmar*, 435 N.W.2d 641, 643, 644 n. 2 (Minn.App.1989) (concluding that claims based upon the emission of offensive odors are nuisance claims, not trespass claims, because the claims alleged "interference

the trespass is committed" and that "[o]ne maliciously annoying another by means even of loud noises ... is guilty of trespass." 100 Minn. at 389–90, 111 N.W. at 296. This discussion, however, is referencing not the tort of trespass to land, which is the claim at issue here, but the broader common law usage of the word "trespass." *See Snow v. City of Columbia*, 305 S.C. 544, 409 S.E.2d 797, 800 n. 3 (S.C.Ct.App.1991) ("The word 'trespass' in medieval usage referred to wrongdoing in the general sense, ... not to the later nominate tort of trespass consisting of intentional and direct injury to lands, goods, or the person."); Stephen H. Lesher, *Trespass: The Origin of Everything*, http://www.slesher.com/trespass.html (last visited July 18, 2012) (discussing how originally, trespass referred to every wrong but eventually was transformed into four types of wrongs, *"trespass quare clausum fregit"* (trespass to land), *"trespass de bonis asportatis"* (conversion), *"trespass vi et armis"* (assault or battery), and *"trespass in consimili casu"* (any other tort)); *see also* William J. Bowman & Patrick F. Hofer, *The Fallacy of Personal Injury Liability Insurance Coverage for Environmental Claims*, 12 Va. Envtl. L.J. 393, 411 (1993) ("[T]o examine the history of trespass is to explore the history of all torts, for it evolved into the form of redress for all civil wrongs.... Trespass to land was but one of these wrongs."). The cases we cited in *Whittaker* confirm this broader meaning. 100 Minn. at 390, 111 N.W. at 296 (citing *Shellabarger v. Morris*, 115 Mo.App. 566, 91 S.W. 1005, 1005–07 (1905) (discussing that defendant committed a trespass to the person when she entered plaintiff's land and hit plaintiff); *Donahue v. Keystone Gas Co.*, 181 N.Y. 313, 73 N.E. 1108 (1905) (recognizing that defendant was responsible for damages caused to trees due to defendant's negligence in releasing gas fumes near the tree roots)).

with [plaintiffs'] use and enjoyment of their land, not invasion of their exclusive possession").

The court of appeals forged new ground in this case and extended Minnesota trespass jurisprudence when it held that a trespass could occur through the entry of intangible objects, such as the particulate matter at issue here. *Johnson,* 802 N.W.2d at 388–89. The court looked outside Minnesota to support the holding it reached.[8] *Id.* at 388–89 (citing *Borland v. Sanders Lead Co.,* 369 So.2d 523 (Ala. 1979); *Bradley v. Am. Smelting & Ref. Co.,* 104 Wash.2d 677, 709 P.2d 782 (1985)).

In *Bradley,* the Washington Supreme Court held that particulate matter deposited on the plaintiff's land from the defendant's copper smelter could constitute a trespass. 709 P.2d at 784, 790. And in *Borland,* the Alabama Supreme Court upheld a trespass claim based on the defendant's "emission of lead particulates and sulfoxide gases" that the plaintiffs alleged accumulated on their property. 369 So.2d at 525–26. These cases go beyond our precedent because they conclude that intangible objects can support a claim for trespass to land.

█ In addition, given that "the ambient environment always contains particu-late matter from many sources," the expansion of the tort of trespass in cases such as *Bradley* and *Borland* to include invasions by intangible matter potentially "subject[s] countless persons and entities to automatic liability for trespass absent any demonstrated injury." *John Larkin, Inc.,* 959 A.2d at 555; *see also Borland,* 369 So.2d at 529 ("It might appear, at first blush, from our holding today that every property owner in this State would have a cause of action against any neighboring industry which emitted particulate matter into the atmosphere, or even a passing motorist, whose exhaust emissions come to rest upon another's property."). To guard against that result, the courts in both *Bradley* and *Borland* required that it be reasonably foreseeable that the intangible matter "result in an invasion of plaintiff's possessory interest," and that the invasion caused "substantial damages" to the plaintiff's property. *Borland,* 369 So.2d at 529; *accord Bradley,* 709 P.2d at 791. This formulation of trespass, however, conflicts with our precedent defining the elements of trespass. Under Minnesota trespass law, entry upon the land that interferes with the landowner's right to exclusive possession results in trespass whether that interference was reasonably foreseeable or whether it caused damages. *See H. Chris-*

---

8. The court of appeals also cited our decision in *Anderson v. Department of Natural Resources,* 693 N.W.2d 181 (Minn.2005), and a prior case from that court—*Red River Spray Service, Inc. v. Nelson,* 404 N.W.2d 332 (Minn.App.1987). *Johnson,* 802 N.W.2d at 388. These cases are inapposite to the question presented in this case because the claims at issue in those cases were not trespass claims. For example, the portion of our opinion in *Anderson* on which the court of appeals relied discusses the concept of the duty that adjoining landowners owe to one another. *Johnson,* 802 N.W.2d at 388 (citing *Anderson,* 693 N.W.2d at 187). The concept of duty is a negligence concept. *See, e.g., Domagala v. Rolland,* 805 N.W.2d 14, 22 (Minn.2011) (stat-ing the elements of negligence). The court of appeals case similarly discusses negligence principles. *See Red River Spray Serv.,* 404 N.W.2d at 334 (holding that a plaintiff has a claim for negligence when pesticide drift actually damages his crops). As we have discussed above, negligence, or lack thereof, on the part of the alleged trespasser is not relevant to a determination of the question of whether trespass occurs. *See H. Christiansen & Sons, Inc.,* 225 Minn. at 480, 31 N.W.2d at 273–74. The court of appeals' reliance on negligence cases to support its determination that Minnesota recognizes a claim for trespass by particulate matter was therefore misplaced.

*tiansen & Sons, Inc.,* 225 Minn. at 480, 31 N.W.2d at 273–74; *Sime,* 213 Minn. at 481, 7 N.W.2d at 328.

Not only is the rule from the *Bradley* and *Borland* courts inconsistent with our trespass precedent, but the rule in those cases also blurs the line between trespass and nuisance. Traditionally, trespasses are distinct from nuisances: "[t]he law of nuisance deals with indirect or intangible interference with an owner's use and enjoyment of land, while trespass deals with direct and tangible interferences with the right to exclusive possession of land." Dobbs, *supra,* § 50 at 96. But in cases like *Bradley* and *Borland,* the courts "call[ ] the intrusion of harmful microscopic particles" a trespass and not a nuisance, and then "us[e] some of the techniques of nuisance law to weigh the amount and reasonableness of the intrusion." Dobbs, *supra,* § 50 at 96. Because *Bradley* and *Borland* require a showing of reasonable foreseeability and substantial damages, they essentially disregard the traditional understanding of trespass under Minnesota law, and they are "in reality, examples of either the tort of private nuisance or liability for harm resulting from negligence" and not trespass cases at all. Keeton, *supra,* § 13 at 71–72.

But the Johnsons argue that *Bradley* and *Borland* reflect the modern view of trespass and urge us to likewise abandon the traditional distinctions between trespass and nuisance when considering invasions by particulate matter. We decline the Johnsons' invitation to abandon the traditional distinctions between trespass and nuisance law. Our trespass jurisprudence recognizes the unconditional right of property owners to exclude others through the ability to maintain an action in trespass even when no damages are prova-

ble. *See, e.g., Sime,* 213 Minn. at 481, 7 N.W.2d at 328. The rule the Johnsons advocate, and that the court of appeals adopted, erodes this right because it imposes on the property owner the obligation to demonstrate that the invasion causes some consequence. *See Johnson,* 802 N.W.2d at 389. Imposing this restriction on a trespass claim is inconsistent with our precedent that provides a remedy to a property owner "for any trivial trespass." *Romans,* 217 Minn. at 180, 14 N.W.2d at 486. And requiring that a property owner prove that she suffered some consequence from the trespasser's invasion before she is able to seek redress for that invasion "offends traditional principles of ownership" by "endanger[ing] the right of exclusion itself." *Adams,* 602 N.W.2d at 217, 221 (declining to recognize a trespass claim for dust, noise, and vibrations emanating from defendant's mining operation).

Moreover, it is not necessary for us to depart from our traditional understanding of trespass because other causes of action—nuisance and negligence—provide remedies for the type of behavior at issue in this case. *Cf. Lake v. Wal–Mart Stores, Inc.,* 582 N.W.2d 231, 236 (Minn.1998) (concluding that "we are not persuaded that a new cause of action should be recognized if little additional protection is afforded plaintiffs"). Indeed, if a defendant's emission of particulate matter causes enough damage to meet the court of appeals' "[discernible] and consequential amounts" element, *Johnson,* 802 N.W.2d at 389, the emission will also likely be an unreasonable interference with plaintiff's use and enjoyment of his land, and therefore constitute a nuisance, *see Highview N. Apartments v. Cnty. of Ramsey,* 323 N.W.2d 65, 71 (Minn.1982).[9]

9. The dissent would have us conclude that intangible objects can (but only sometimes)

cause a trespass. The dissent argues that a trespass might occur "when [an] intangible

Our review of cases from other jurisdictions reveals that courts have abandoned the distinction between trespass and nuisance, at least in part, because courts generally favor allowing parties to vindicate wrongs and, in many jurisdictions, actions for trespass have a longer statute of limitations than actions for nuisance. *See, e.g., Bradley,* 709 P.2d at 786, 791 (holding that the 3–year trespass statute of limitations applied rather than the 2–year nuisance statute of limitations). But there is no statute of limitations difference in Minnesota. Generally, both trespass and nuisance have a 6–year statute of limitations. Minn.Stat. § 541.05, subd. 1(2), (3) (2010) (creating a 6–year statute of limitations for statutory actions like nuisance and establishing a 6–year statute of limitations for trespass). And in a case alleging damages caused by pesticides, like this case, the applicable statute of limitations is 2 years regardless of the type of claim the plaintiff brings. Minn.Stat. § 541.07(7) (2010) (creating a 2–year statute of limitations for all tort claims against pesticide applicators). Simply put, the policy concerns that have compelled other jurisdictions to abandon the traditional view of trespass are not present in Minnesota.

In summary, trespass claims address tangible invasions of the right to exclusive possession of land, and nuisance claims address invasions of the right to use and enjoyment of land. The Johnsons do not allege that a tangible object invaded their land. The Johnsons' claim is that the Cooperative's actions have prevented them from *using* their land as an organic farm, not that any action of the Cooperative has prevented the Johnsons from possessing any part of their land. The Johnsons' claim is one for nuisance, not trespass. We therefore hold that the district court did not err in concluding that the Johnsons' trespass claim failed as a matter of law.[10]

## II.

Having concluded that the Johnsons' trespass claim fails as a matter of law, we turn next to their nuisance and negligence per se claims. The Johnsons allege that the pesticide drift from the Cooperative's spraying constituted a nuisance because it caused an interference with their use and enjoyment of their land. The Johnsons also allege that the pesticide drift constitutes negligence per se, asserting that the Cooperative violated Minn.Stat. § 18B.07 (2010) by "direct[ing] ... pesticide[s] onto property beyond the boundaries of the target site," using the pesticides in a manner

object is actually a substance that settles on the land and *damages it.*" (Emphasis added). But, as discussed above, the presence of actual damages is not relevant to a discussion of trespass law because damages are not an element of a trespass claim in Minnesota. *Greenwood,* 220 Minn. at 312, 19 N.W.2d at 734–35. Adding an element of damages to trespass, as the dissent would have us do, would also put our courts in the unenviable position of having to decide how much damage caused by what kind of actual substance is enough to support a trespass. Making these razor thin distinctions would inevitably lead to inconsistency and confusion in Minnesota trespass jurisprudence. Moreover, nothing would be gained by forcing Minnesota's courts into making such fine distinctions be-

cause, as we have said, in the event that an intangible object does cause actual damage to property, nuisance and negligence law provide a property owner with adequate remedies.

**10.** The dissent appears to suggest that we have adopted some new standard in our categorical conclusion that particulate matter can never cause a trespass. Our conclusion is not new; rather it is dictated by decades of Minnesota case law and centuries of common law. For the reasons discussed, we decline to, as the dissent would have us do, sweep away all this precedent in the absence of a compelling reason.

inconsistent with their labels, and endangering the Johnsons' agricultural products. The Johnsons seek loss of profits under both the nuisance and negligence per se claims based on their alleged inability to market their crops as organic under 7 C.F.R. § 205.202(b). In addition, the Johnsons claim damages for actual crop losses, inconvenience, and adverse health effects.

■ With respect to the nuisance claim, Minn.Stat. § 561.01 (2010) provides that a nuisance is "[a]nything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." An action seeking an injunction or to recover damages can be brought under the statute "by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance." *Id.* We have recognized nuisance claims when a plaintiff can show that the defendant's conduct caused an interference with the use or enjoyment of the plaintiff's property. *See, e.g., Anderson v. Dep't of Natural Res.,* 693 N.W.2d 181, 192 (Minn.2005) (discussing our nuisance jurisprudence); *Schmidt v. Vill. of Mapleview,* 293 Minn. 106, 108–09, 196 N.W.2d 626, 628–29 (1972); *Huber v. City of Blue Earth,* 213 Minn. 319, 322, 6 N.W.2d 471, 473 (1942). The defendant's liability for nuisance is determined by balancing "the social utility of the defendants' actions with the harm to the plaintiff." *Highview N. Apartments,* 323 N.W.2d at 71.

■ Regarding the Johnsons' negligence per se claim, we have recognized that " 'negligence per se is a form of ordinary negligence that results from violation of a statute.' " *Anderson,* 693 N.W.2d at 189 (quoting *Seim v. Garavalia,* 306 N.W.2d 806, 810 (Minn.1981)). To prove a negligence claim, the plaintiff must show that the defendant breached a duty of care that proximately caused the plaintiff damage. *Domagala v. Rolland,* 805 N.W.2d 14, 22 (Minn.2011). The difference between ordinary negligence and negligence per se is that in negligence per se, a statutory duty of care is substituted for the ordinary prudent person standard "such that a violation of a statute . . . is conclusive evidence of duty and breach." *Gradjelick v. Hance,* 646 N.W.2d 225, 231 n. 3 (Minn.2002).

■ The district court dismissed the Johnsons' nuisance and negligence per se claims because the court concluded that the Johnsons had not proven damages. Specifically, the court concluded that the Johnsons had no evidence of damages "from any alleged drift because there is no evidence said drift caused [the Johnsons] to lose their organic certification and there is no evidence that [the Johnsons] could not still sell their crops as organic since the levels of prohibited substances were below the applicable tolerance levels." Based on this conclusion, the court granted the Cooperative summary judgment and dismissed the Johnsons' nuisance and negligence per se claims. The court of appeals reversed. On appeal from the decision to grant summary judgment, we review de novo the district court's application of the law and its determination that there are no genuine issues of material fact. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.,* 644 N.W.2d 72, 77 (Minn. 2002).

### A.

■ We turn first to the portion of the Johnsons' nuisance and negligence per se claims that are based on 7 C.F.R. § 205.202(b). The Johnsons argue that they had to remove certain fields from organic production for 3 years because pesticides were "applied to" those fields in

violation of 7 C.F.R. § 205.202(b). The Johnsons contend that the phrase "applied to it" in the regulation, read in conjunction with other sections of the NOP, means that *any* application of pesticides to a field, whether intentional or not, requires that the field be taken out of organic production for 3 years.[11] Based on this reading, the Johnsons assert that they were required to take their soybean field back to the beginning of the 3–year transition period because of the 2007 pesticide drift.[12] As a result, the Johnsons claim they lost the ability to market crops from that field as organic, and therefore lost the opportunity to seek the premium prices commanded by organic products.

For its part, the Cooperative argues that the phrase "applied to it" in 7 C.F.R. § 205.202(b), unambiguously means that the organic farmer intentionally applied the prohibited substance to the field. Because the Johnsons did not apply pesticides to the field, the Cooperative argues that section 205.202(b) does not restrict the Johnsons' sale of organic products. In the alternative, the Cooperative argues that if section 205.202(b) is ambiguous,

analysis of the relevant canons of construction confirms its interpretation.

The district court adopted the interpretation of the NOP regulation that the Cooperative advances. But the court of appeals reversed, holding that the phrase "applied to it" "implicitly includes unintentional pesticide drift," and that therefore OCIA had discretion to decertify the Johnsons' soybean field under section 205.202(b). *Johnson*, 802 N.W.2d at 390. And because there was discretion to decertify, the court of appeals concluded that the Johnsons had offered sufficient evidence to survive summary judgment. *Id.* at 391. We agree with the district court that section 205.202(b) does not regulate the Cooperative's pesticide drift.

In order to resolve the interpretation question presented, we must construe the regulation at issue—7 C.F.R. § 205.202(b). Our first task is to determine whether the regulation is ambiguous. *E.g., In re Cities of Annandale & Maple Lake,* 731 N.W.2d 502, 516 (Minn.2007) (considering whether a federal regulation was ambiguous). If it is not ambiguous, we

---

11. On appeal to our court the Johnsons raise, for the first time, a federal preemption argument based on *In re Aurora Dairy Corp. Organic Milk Marketing & Sales Practices Litigation,* 621 F.3d 781 (8th Cir.2010). Because the Johnsons raise this issue for the first time on appeal, the argument is waived. *See Vaughn v. NW Airlines, Inc.,* 558 N.W.2d 736, 745 n. 9 (Minn.1997) (refusing to address a plaintiff's preemption argument when it was not raised as an affirmative defense in the defendant's answer) (citing *Jordan v. Clayton Brokerage Co. of St. Louis, Inc.,* 975 F.2d 539, 541 (8th Cir.1992) (stating that, in federal court, preemption is ordinarily waived if not pleaded)).

12. The Cooperative does not concede that OCIA required the Johnsons to restart the soybean field's 3–year transition period. The August 27, 2007 OCIA letter opines that "[c]hemical drift may have occurred" on part

of the Johnsons' soybean field and states that a chemical analysis is being done. OCIA also said that if chemical analysis "indicates contamination [the Johnsons] must take this land back to the beginning of 36–month transition." "Contamination" is not defined in the letter and there is no other correspondence in the record indicating that OCIA actually directed the Johnsons to take their soybean field back to the beginning of the 3–year transition period. But because we review the facts in the light most favorable to the Johnsons on their appeal from summary judgment, we assume for purposes of this opinion that the 2007 OCIA letter required the Johnsons to restart the field's 3–year transition period. *See Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (noting that we examine the evidence in the light most favorable to the party against whom summary judgment was granted).

apply the plain and ordinary meaning of the words used. *See Exelon Generation Co. LLC v. Local 15 Int'l Bhd. Of Elec. Workers,* 676 F.3d 566, 570 (7th Cir.2012) (stating that the same rules of construction apply to federal administrative rules as to statutes); *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs,* 713 N.W.2d 817, 828 n. 9 (Minn. 2006) (noting that administrative regulations are governed by the same rules of construction that apply to statutes); *cf. Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (noting that when the meaning of a statute "is plain ... the sole function of the courts is to enforce it according to its terms"). In deciding whether the regulation is ambiguous, however, we do not construe the regulation in isolation. Rather, we are to examine the federal regulation in context. *See, e.g., Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* —— U.S. ——, 132 S.Ct. 1670, 1680, 182 L.Ed.2d 678 (2012) (noting that courts are to consider questions of statutory interpretation by looking at phrases in the context of the entire statute).

The OFPA provides important context for interpretation of the regulation because the NOP regulations were drafted to "carry out" the provisions of the OFPA. 7 U.S.C. § 6521(a). The OFPA focuses on the producers and handlers of the products that are marketed and sold as organic. *See* 7 U.S.C. § 6503(a) (directing the Secretary of Agriculture to "establish an organic certification program for producers and handlers of agricultural products"). For example, producers must prepare a plan for the operation of their farms in order to obtain certification to sell their products as organic. *See* 7 U.S.C. §§ 6504, 6513. They must also certify on an annual basis that they have not sold products labeled as organic "except in accordance" with the OFPA, and producers must allow the certifying agent an "on-site inspection" of their farm every year. 7 U.S.C. § 6506(a)(4),(5). Producers also must keep records for 5 years "concerning the production ... of agricultural products sold ... as organically produced." 7 U.S.C. § 6511(d).

In addition to these general provisions, the OFPA also establishes certain crop production practices that are prohibited when producers seek to sell products as organic. One of these specific practices provides that in order to be sold as organic, the product must "not be produced on land to which any prohibited substances, including synthetic chemicals, have been applied during the 3 years immediately preceding the harvest of the agricultural products." 7 U.S.C. § 6504(2). The OFPA also specifically provides that producers of organic products "shall not apply materials to ... seeds or seedlings that are contrary to, or inconsistent with, the applicable organic certification program." 7 U.S.C. § 6508(a).

When we read the phrase "applied to it" in 7 C.F.R. § 205.202(b), within the context of the OFPA's focus on regulating the practices of the producer of organic products, we conclude that this phrase unambiguously regulates behavior by the producer. In other words, in order for products to be sold as organic, the organic farmer must not have applied prohibited substances to the field from which the product was harvested for a period of 3 years preceding the harvest.[13]

---

13. The dissent argues that the phrase "applied to it" in 7 C.F.R. § 205.202(b) "indicates that the concern is what the land in question was exposed to not how it was exposed, why it was exposed, or who caused the exposure." But the word "applied" usually indicates intentionality. *See The American Heritage Dictionary of the English Language*

The Johnsons urge us, however, to construe the phrase "applied to it" to include actions of third parties, such as the pesticide drift that resulted from the Cooperative's spraying activity at issue here. The Johnsons base their construction on the use of the word "application" in 7 C.F.R. § 205.202(c) and 7 C.F.R. § 205.400(f)(1). Section 205.202(c) provides that any field from which crops are intended to be sold as organic must have distinct boundaries and buffer zones to prevent "unintended application of a prohibited substance." Section 205.400 details the requirements that a producer must meet in order to gain organic certification. Among other things, section 205.400 requires a producer to "[i]mmediately notify the certifying agent concerning any: [a]pplication, including drift, of a prohibited substance to any field . . . that is part of an [organic] operation." 7 C.F.R. § 205.400(f)(1). Because these regulations specifically include "unintended" applications and "drift" as types of applications, the Johnsons argue that the phrase "applied to it" in section 205.202(b) must similarly be read to include the Cooperative's pesticide drift. We disagree.

As is true for the OFPA and the NOP as a whole, section 205.202(c) is also directed at the producer of organic products, not third parties. In this section, the NOP requires that producers who have been certified as organic create buffers between the fields from which organic products will be harvested and other fields. This provision therefore does not support the conclusion that section 205.202(b) should be read to cover conduct by third parties.

 Similarly, section 205.400 does not support the Johnsons' proposed construction of section 205.202(b). In this section, "drift" is the subject of a specific regulation. Section 205.400 confirms that when the NOP regulates "drift," that intention is made explicitly clear. But section 205.202(b) does not regulate "drift"; instead, it provides that prohibited substances are not to be "applied to" organic fields. The use of different words in the two provisions supports the conclusion that the sections address different behavior. *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 62–63, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("[T]he question is whether Congress intended its different words to make a legal difference. We normally presume that, where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted) (internal quotation marks omitted)). The compliance provision in the OFPA statute—7 U.S.C. § 6511—and the corresponding NOP regulation—7 C.F.R. § 205.671–confirm this interpretation.

The compliance provision requires, as a way to enforce the requirements in the

---

86 (5th ed.2011) (giving, as examples of usage for the word apply: "applies all *her* money to *her* mortgage," and "applied *myself* to *my* studies") (emphasis added). And when the word "applied" is used in other sections of the NOP, it is used to refer to intentional applications of something. *See* 7 C.F.R. §§ 205.203, 205.206, 205.403(c)(3). Moreover, other sections, specifically sections 205.671 and .672, indicate that the NOP is very concerned about why and how organic fields were exposed to prohibited substances. *See* 7 C.F.R. § 205.671 (stating that if prohibited substances are found on organically

farmed products, regulators "may conduct an investigation of the certified operation to determine the cause of the prohibited substance"); 7 C.F.R. § 205.672 (stating that when prohibited substances are applied to an organic operation by a governmental entity in an emergency, the presence of the prohibited substance does not affect the land's organic status); *see also* National Organic Program 65 Fed.Reg. 80,547, 80,629–30 (Dec. 21, 2000) (explaining that an intentional application of a prohibited substance gives rise to more serious consequences than the mere presence of prohibited substances).

OFPA, that "the certifying agent ... utilize a system of residue testing to test products sold ... as organically produced." 7 U.S.C. § 6511(a). If the agent "determines" that a product intended to be sold as organic "contains any [detectible] pesticide," the producer may be required "to prove that any prohibited substance was not applied to" that product. 7 U.S.C. § 6511(c)(1). Should the agent determine that the residue came from the "intentional application of a prohibited substance," the product may not be sold as organic. 7 U.S.C. § 6511(c)(2)(A). In addition, if "unavoidable residual environmental contamination" is present on the product "at levels that are greater than" those set for the substance at issue, the product may not be sold as organic. 7 U.S.C. § 6511(c)(2)(B). The OFPA thus contemplates that organic products with some amount of prohibited substance residue on them may be marketed and sold as organic. Specifically, if the residue is caused by "environmental contamination," but does not exceed the requisite levels, the product may continue to be sold as organic. *Id.*

The NOP regulation that specifically implements this compliance provision in the statute—7 C.F.R. § 205.671—confirms this interpretation. Section 205.671 addresses the disqualifying level for "unavoidable residual environmental contamination" referenced in section 6511 of the OFPA. Section 205.671 provides that a crop cannot be sold as organic "[w]hen residue testing detects prohibited substances at levels that are greater than 5 percent of the Environmental Protection Agency's [EPA] tolerance for the specific residue." 7 C.F.R. § 205.671. Under the plain terms of section 205.671, therefore, crops can be sold

as organic even if testing shows prohibited substances on those crops as long as the amounts detected do not exceed 5 percent of EPA limits. But if, as the Johnsons contend, any application—including drift—were prohibited by section 205.202(b), then section 205.671 would be superfluous.

■■■■ As the Johnsons read section 205.202(b), any amount of pesticide, no matter how it came into contact with the field, would require that the field be taken out of organic production for 3 years. There would accordingly be no organic crops left that would be covered under section 205.671 of the NOP or 7 U.S.C. § 6511(c)(2). And the OFPA and NOP would not need a provision allowing crops with minimum levels of pesticide on them (i.e., less than 5 percent) to be sold as organic because such crops would necessarily have been harvested from fields ineligible for organic production. We are not to adopt an interpretation that renders one section of the regulatory scheme a nullity. *See Markham v. Cabell*, 326 U.S. 404, 409, 66 S.Ct. 193, 90 L.Ed. 165 (1945) (stating that a law will not be strictly read if such reading "results in the emasculation or deletion of a provision which a less literal reading would preserve."). Because the Johnsons' interpretation nullifies part of the OFPA and the NOP, that interpretation is not reasonable, and we decline to adopt it. We instead conclude that "applied to it" used in section 205.202(b), when read in the context of the OFPA and the NOP regulations as a whole, unambiguously refers to prohibited substances that the producer intentionally puts on a field from which crops are intended to be sold as organic.[14]

14. The dissent states that, under our interpretation of the NOP, "if a third-party intentionally applies a prohibited pesticide to an organic farm field in a quantity sufficient to leave a residue which violates [section 205.202(b)], 7 U.S.C. § 6511(c)(2)(A) (2006) would not prohibit the product's sale as an organic product because the producer had not applied the prohibited substance." We agree that 7 U.S.C. § 6511(c)(2)(A) would not

When the regulation is read in the context of the NOP and the OFPA as a whole and given the statutory scheme's focus on regulating the practices of producers, we conclude that section 205.202(b) does not cover the Cooperative's pesticide drift. Rather, this section governs an organic producer's intentional application of prohibited substances onto fields from which organic products will be harvested.[15]

 Having concluded that "applied to it" refers to situations where the producer has applied prohibited sub-

exclude such a product from organic sale. Rather, 7 U.S.C. § 6511(c)(2)(B), which prohibits the organic sale of products with prohibited substances "present at levels that are greater than unavoidable residual environmental contamination," and 7 C.F.R. § 205.671, which sets the "5 percent rule," would provide the prohibition.

The difference between our view and the dissent's is that under our view, where the organic farmer is not the source of the contamination, the farmer would be prohibited from marketing the affected *products* as organic for 1 year, whereas under the dissent's view, the farmer would have to take the affected *field* out of organic production for 3 years. *Compare* 7 C.F.R. § 205.671, *with* 7 C.F.R. § 205.202(b). Such a result is both unfair to organic farmers and inconsistent with the general understanding of the OFPA and the NOP as process based regulations. *See* 7 C.F.R. § 205.672(a) (stating that, other than losing the ability to market the crops that actually had prohibited substances applied to them, an organic farm's status "shall not be affected" when a prohibited substance is applied to it "as a result of a Federal or State emergency pest or disease treatment program"); National Organic Program, 65 Fed.Reg. 80,547, 80633 (Dec. 21, 2000) (discussing 7 C.F.R. § 205.672 and concluding that, while "[w]e understand that commenters would like us to remove the certification of an organic operation that has been treated with a prohibited substance ... organic certification is a production claim, not a content claim"); 65 Fed.Reg. at 80,556 ("[O]rganic standards are process based.... As long as an organic operation has not used excluded methods and takes reasonable steps to avoid contact with the products of excluded methods ... [the] presence of the products of excluded methods should not affect the status of an organic product or operation."); 65 Fed.Reg. at 80,629–30 (discussing that organic operations are to be punished more severely if, after finding prohibited substances on a field, it is discovered that the organic producer applied them); *see also* S.Rep. No. 101–

357, at 277 (1990) *reprinted in* 1990 U.S.C.C.A.N. 4656, 4953–54 (stating that the term "organic" is "a production claim and not a residue-free content claim," and therefore, while organic producers may produce organic products that have been affected by "drift from a neighboring farm," the OFPA "does not intend to prohibit minimal residue contamination that does not result from practices used by the organic farming operation"); U.S. Dep't of Agric.–Agric. Mktg. Serv. *National Organic Program, http://www.ams.usda.gov/AMSv1.0/nop* (last updated June 6, 2012) ("Organic is a labeling term that indicates that the food or other agricultural product *has been produced through approved methods....*" (emphasis added)).

**15.** Our plain language construction of the regulation is consistent with the generally accepted understanding of the organic standards as process based. In announcing the final rule establishing the NOP, the United States Department of Agriculture stated:

> When we are considering drift issues, it is particularly important to remember that organic standards are process based. Certifying agents attest to the ability of organic operations to follow a set of production standards and practices that meet the requirements of the Act and the regulations. This regulation prohibits the use of excluded methods in organic operations. The presence of a detectable residue of a product of excluded methods alone does not necessarily constitute a violation of this regulation. As long as an organic operation has not used excluded methods and takes reasonable steps to avoid contact with the products of excluded methods as detailed in their approved organic system plan, the un*intentional presence of the products of* excluded methods should not affect the status of an organic product or operation.

National Organic Program, 65 Fed.Reg. 80,-547, 80,556 (Dec. 21, 2000) (codified at 7 C.F.R. § 205).

stances to the field, we must consider whether the district court correctly dismissed the Johnsons' nuisance and negligence per se claims based on 7 C.F.R. § 205.202(b). While the district court, both parties, and the court of appeals characterize the dismissal as one based on a lack of prima facie evidence of damages, the Johnsons clearly made a prima facie showing of damages; they actually took their soybean field back to the beginning of the 3–year transition period and lost the opportunity to market crops from that field as organic during that time period. The question therefore is not one of damages but is more properly framed as a question of causation. *Cambern v. Hubbling*, 307 Minn. 168, 171, 238 N.W.2d 622, 624 (1976) ("If the trial court's rule is correct, it is not to be reversed solely because its stated reason was not correct."). And "[w]hile the existence of [causation] is usually a question of fact for the jury, 'when reasonable minds could reach only one conclusion,' it is a question of law." *Lietz v. N. States Power Co.*, 718 N.W.2d 865, 872 (Minn.2006) (quoting *Canada v. McCarthy*, 567 N.W.2d 496, 506 (Minn.1997)). In other words, the question presented is whether the Johnsons created an issue for trial that the Cooperative's pesticide drift required the Johnsons to remove their field from organic production due to 7 C.F.R. § 205.202(b). We conclude that they did not.

Construing the evidence in the light most favorable to the Johnsons, their certifying agent, OCIA, directed them to take their soybean fields out of organic production for 3 years. But any such directive was inconsistent with the plain language of 7 C.F.R. § 205.202(b). It was also inconsistent with the OFPA because the Johnsons presented no evidence that any residue exceeded the 5 percent tolerance level in 7 C.F.R. § 205.671. The certifying agent's erroneous interpretation of section 205.202(b) and the OFPA was the proximate cause of the Johnsons' injury, but the Johnsons cannot hold the Cooperative liable for the certifying agent's erroneous interpretation of the law. The Johnsons' remedy for the certifying agent's error was an appeal of that determination because it was "inconsistent with the" OFPA. 7 U.S.C. § 6520(a)(2).

Under the plain language of 7 C.F.R. § 205.202(b), a third party's pesticide drift cannot cause a field to lose organic certification. The Cooperative's pesticide drift therefore could not proximately cause the Johnsons' soybean field to be taken out of organic production for 3 years. *See Flom v. Flom*, 291 N.W.2d 914, 917 (Minn.1980) (noting that to satisfy the element of proximate cause there must be a showing that the defendant's "conduct was a substantial factor in bringing about the injury"). Because the Cooperative was not, and could not be, the proximate cause of the Johnsons' damage, we hold that the district court properly granted summary judgment to the Cooperative on the Johnsons' nuisance and negligence per se claims based on section 205.202(b).

### B.

Our conclusion that the district court properly dismissed the Johnsons' negligence per se and nuisance claims based on 7 C.F.R. § 205.202(b), does not, however, end our analysis of those claims. The Johnsons also supported their nuisance and negligence per se claims with allegations separate from the damages that they contend were caused due to the OCIA's interpretation of section 205.202(b). Specifically, the Johnsons claim that the MDA required them to destroy a portion of their transitional soybeans affected by the alleged 2007 drift because of "the presence of dicamba" on and "visual damage" to the soybeans. The Johnsons argue that the

Cooperative is liable, under nuisance and negligence per se theories, for damages resulting from the destruction of these soybeans.[16] Because the district court failed to address whether there were any genuine issues of material fact on this aspect of the Johnsons' nuisance and negligence per se claims, we hold that the court erred when it dismissed these claims.

In addition, the Johnsons' nuisance claim alleges that pesticides below the recommended dosage can spur weed growth and that they have had to take extra measures to control weeds in 2007 and 2008 as a result of drift onto their fields from the Cooperative's actions. They also contend that the drift caused additional record-keeping and other burdens in connection with the operation of their farm. Finally, they allege that Oluf Johnson suffers from "cotton mouth, swollen throat and headaches" when exposed to pesticide drift. In *Highview North Apartments v. County of Ramsey*, we held that "disruption and inconvenience" caused by a nuisance are actionable damages. 323 N.W.2d 65, 73 (Minn.1982). The "inconvenience" and adverse health effects the Johnsons allege are the type of claims contemplated in *Highview North Apartments*, and if proven, they may affect the Johnsons' ability to use and enjoy their land and thereby constitute a nuisance. *See* Minn.Stat. § 561.01. Because the district court failed to address whether there are any genuine issues of material fact on this aspect of the Johnsons' nuisance claim, we hold that the court erred when it dismissed the nuisance claim.

■ The same is true for the Johnsons' request for a permanent injunction. The Johnsons sought a permanent injunction under the nuisance statute, Minn.Stat. § 561.01. Injunctive relief is a permissible remedy under that statute. *Id.; see Highview N. Apartments*, 323 N.W.2d at 73. The district court dismissed the Johnsons' request for injunctive relief because it concluded that the Johnsons did not have a viable nuisance claim under 7 C.F.R. § 205.202(b), and therefore had no basis on which to seek an injunction. *See Ryan v. Hennepin Cnty.*, 224 Minn. 444, 448, 29 N.W.2d 385, 387 (1947) ("Injunctive relief is a remedy and not, in itself, a cause of action, and a cause of action must exist before injunctive relief may be granted." (citation omitted)). But, as set forth above, the Johnsons' nuisance claim, to the extent it is not based on 7 C.F.R. § 205.202(b), remains viable. Because the Johnsons still have a viable nuisance claim, and an injunction is a potential remedy for a nuisance, we hold that the district court erred when it dismissed the Johnsons' request for permanent injunctive relief.

### III.

We turn next to the district court's denial of the Johnsons' motion to amend their complaint to include claims based on the 2008 incidents of pesticide drift. The legal

---

**16.** This aspect of the Johnsons' negligence per se claim is grounded in Minn.Stat. § 18B.07 (2010), which governs the use of pesticides. Subdivision 2 provides, in relevant part:

(a) A person may not use, store, handle, distribute, or dispose of a pesticide, rinsate, pesticide container, or pesticide application equipment in a manner:

(1) that is inconsistent with a label or labeling as defined by FIFRA [the Federal Insecticide, Fungicide, and Rodenticide Act];

(2) that endangers humans, damages agricultural products, food, livestock, fish, or wildlife; or

(3) that will cause unreasonable adverse effects on the environment.

(b) A person may not direct a pesticide onto property beyond the boundaries of the target site. A person may not apply a pesticide resulting in damage to adjacent property.

Minn.Stat. § 18B.07, subd. 2(a), (b).

theories in the proposed amended complaint are identical to the original complaint, but the Johnsons allege damages, including the inconveniences just mentioned, unique to the 2008 incidents. The district court denied the Johnsons' motion to amend their complaint to include claims based on the 2008 incidents because "amendment would be futile." This ruling was based on the court's conclusions that Minnesota does not recognize a claim for trespass by particulate matter and that the Johnsons could not prove any negligence per se or nuisance damages based on 7 C.F.R. § 205.202(b).

We review a district court's denial of a motion to amend a complaint for an abuse of discretion. *Rosenberg v. Heritage Renovations, LLC,* 685 N.W.2d 320, 332 (Minn.2004). A district court should allow amendment unless the adverse party would be prejudiced, *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993), but the court does not abuse its discretion when it disallows an amendment where the proposed amended claim could not survive summary judgment, *Rosenberg,* 685 N.W.2d at 332.

As discussed above, the Johnsons' 2007 trespass claim and claims based on 7 C.F.R. § 205.202(b), fail as a matter of law and therefore amending the complaint to include identical claims based on the 2008 incidents would be futile. To the extent that the Johnsons' proposed amended complaint includes such claims, the district court properly denied the Johnsons' motion to amend. But to the extent that the amended complaint alleges claims for the 2008 incidents that are not based in trespass or on 7 C.F.R. § 205.202(b), we hold that the district court abused its discretion by denying the motion to amend without first considering whether such amended claims could survive summary judgment. *See Rosenberg,* 685 N.W.2d at 332.

## IV.

In summary, we conclude that the Johnsons' trespass claim, and nuisance and negligence per se claims based on 7 C.F.R. § 205.202(b), fail as a matter of law. To the extent that the court of appeals' decision would reinstate those claims and allow the Johnsons to amend their complaint to include those claims for the 2008 incidents of pesticide drift, we reverse. But we conclude that the district court erred in (1) dismissing the Johnsons' nuisance and negligence per se claims to the extent those claims are not based on 7 C.F.R. § 205.202(b), and (2) denying the Johnsons' motion to amend their complaint to include claims for the 2008 incidents to the extent those claims are not based on trespass or 7 C.F.R. § 205.202(b).

Affirmed in part, reversed in part, and remanded.

PAGE, Justice (dissenting).

I respectfully dissent.

## I.

The court holds that Minnesota does not recognize claims for trespass by particulate matter. I disagree with the breadth of the court's holding. The term "particulate matter" encompasses a variety of substances, but the court's one-size-fits-all holding that particulate matter can never cause a trespass fails to take into account the differences between these various substances. The Environmental Protection Agency defines "particulate matter" as "a complex mixture of extremely small particles and liquid droplets" "made up of a number of components, including acids (such as nitrates and sulfates), organic chemicals, metals, and soil or dust particles." United States Envtl. Prot. Agency, http://www.epa.gov/pm/ (last updated June 28, 2012). Some particles are sufficiently large or dark to be observable, "such as

dust, dirt, soot, or smoke." United States Envtl. Prot. Agency, http://www.epa.gov/pm/basic.html (last updated June 15, 2012). In terms of size, the largest "inhalable coarse particles" are 10 micrometers in diameter; that is one-seventh the diameter of a strand of human hair. *Id.* It seems to me that differences in size, quantity, and harmfulness of varying types of particulate matter will have an effect on whether the invasion by the substance causes a trespass. For example, if someone causes harmful dust to enter a person's land and that dust settles on the person's land and interferes with the owner's possession of the land, it would seem that a trespass has occurred. However, if that person were to cause car exhaust, which presumably dissipates quickly in the air, to enter a person's land, it would seem that a trespass would not occur.

The distinction between trespass and nuisance should not be based on whether the object invading the land is tangible or intangible. Whereas that distinction may have been logical at times when science was not as precise as it is now, that distinction is not sound today. *See, e.g., Martin v. Reynolds Metals Co.,* 221 Or. 86, 342 P.2d 790, 793 (1959) (suggesting that one explanation for the historical adherence to a distinction between tangible and intangible invasions of land was that "science had not yet peered into the molecular and atomic world of small particles"). We have previously held that invasion by water constitutes a trespass and invasion by a bullet constitutes a trespass. *Greenwood v. Evergreen Mines Co.,* 220 Minn. 296, 311–12, 19 N.W.2d 726, 734–35 (1945) (water); *Whittaker v. Stangvick,* 100 Minn. 386, 391, 111 N.W. 295, 297 (1907) (bullets and fallen game). It is a small extension, if any, of those holdings to conclude that invasion by pesticide can constitute a trespass, especially because pesticides are designed to affect the land, unlike an invasion by a bullet, which creates no such risk.

The proper distinction between trespass and nuisance should be the nature of the property interest affected. *See Borland v. Sanders Lead Co.,* 369 So.2d 523, 529 (Ala. 1979) ("Whether an invasion of a property interest is a trespass or a nuisance does not depend upon whether the intruding agent is 'tangible' or 'intangible.' Instead, an analysis must be made to determine the interest interfered with. If the intrusion interferes with the right to exclusive possession of property, the law of trespass applies. If the intrusion is to the interest in use and enjoyment of property, the law of nuisance applies."); *see also* J.D. Lee & Barry A. Lindahl, 4 *Modern Tort Law: Liability and Litigation* § 38:1 (2d ed.2006) ("The distinction between nuisance and trespass is in the difference in the interest interfered with: in a nuisance action it is the use and enjoyment of land, while the interest in a trespass action is the exclusive possession of land."). As other courts have suggested, the same conduct may constitute both trespass and nuisance. *See Borland,* 369 So.2d at 527 (noting, "the same conduct on the part of a defendant may, and often does, result in the actionable invasion of" exclusive possession of the property and use and enjoyment). Thus, while the court concludes that invasion by an intangible object never interferes with a property owner's possessory rights, I conclude that in some circumstances it may, particularly when that intangible object is actually a substance that settles on the land and damages it. *See id.* at 530 ("[I]f, as a result of the defendant's operation, the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the *res,* then the plaintiff may seek his remedy in trespass. . . .");·

*cf. Bradley v. Am. Smelting & Ref. Co.,* 104 Wash.2d 677, 709 P.2d 782, 791 (1985) ("When airborne particles are transitory or quickly dissipate, they do not interfere with a property owner's possessory rights and, therefore, are properly denominated as nuisances.").

Rather than adopt a categorical conclusion that particulate matter can never cause a trespass, I conclude, as discussed above, that it may constitute a trespass under some circumstances. Here, on the record presented at this stage in the litigation, it is not clear to me whether the pesticides in this case constituted a trespass. Therefore, I would allow the suit to go forward and permit the record to be developed to resolve that question.

## II.

I also dissent from the court's interpretation of 7 C.F.R. § 205.202(b) (2012). That regulation reads: "Any field or farm parcel from which harvested crops are intended to be sold, labeled, or represented as 'organic,' must: ... (b) Have had no prohibited substances, as listed in § 205.105, applied to it for a period of 3 years immediately preceding harvest of the crop[.]" The court concludes that this regulation does not apply to the alleged conduct here because a pesticide is not "applied to" a farm if its presence is caused by drift, as opposed to being directly applied by the organic farmer. Our rules of statutory interpretation (which we apply to regulations) do not permit us to add words to a regulation whether the words were "purposefully omitted or inadvertently overlooked." *Premier Bank v. Becker Dev., LLC,* 785 N.W.2d 753, 760 (Minn.2010). Rather, when we interpret a rule, we consult "the language itself, the specific context in which that language is used, and the broader context of the [rule] as a whole." *Robinson v. Shell Oil Co.,*

519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). In this case, the court concludes that the OFPA's focus on producers and handlers of organic products informs its interpretation that "applied to" in section 205.202(b) refers only to application of pesticides by the organic farmer. This conclusion flies in the face of our rules of construction as well as common sense.

First, the language of section 205.202(b) is silent with respect to who applied the prohibited substances. The plain language of the phrase—"Any field or farm parcel ... must: ... (b) Have had no prohibited substances ... applied to it"—indicates that the concern is what the land in question was exposed to, not how it was exposed, why it was exposed, or who caused the exposure. Moreover, use of the passive voice generally indicates the focus of the language is "whether something happened—not how or why it happened." *Dean v. United States,* 556 U.S. 568, 572, 129 S.Ct. 1849, 173 L.Ed.2d 785 (2009).

Further, numerous regulations in Title 7, Part 205, explicitly govern the behavior of producers and handlers. *See* 7 C.F.R. § 205.200 (2012) ("The producer or handler ... must comply with the applicable provisions...."); 7 C.F.R. § 205.201(a) (2012) ("The producer or handler ... must develop an organic production or handling system plan...."); 7 C.F.R. § 205.203(a) (2012) ("The producer must select and implement tillage and cultivation practices...."); 7 C.F.R. § 205.203(b) (2012) ("The producer must manage crop nutrients and soil fertility...."); 7 C.F.R. § 205.203(c) (2012) ("The producer must manage plant and animal materials...."). The distinct language in section 205.202(b) is striking in comparison to these provisions. In contrast to the provisions that specifically regulate the behavior of producers, the language in section 205.202(b)

focuses on a characteristic of the field and does not refer to the producer, handler, or farmer. While section 205.202(a) implicitly references producers and handlers, by referring to provisions that specifically prescribe their conduct, section 205.202(b) does not do so in any way.

Evidently, under the court's reading of the regulations, if a third party intentionally applies a prohibited pesticide to an organic farm field in a quantity sufficient to leave a residue that violates the regulation, 7 U.S.C. § 6511(c)(2)(A) (2006) would not prohibit the product's sale as an organic product because the producer had not applied the prohibited pesticide. *See* 7 U.S.C. § 6511(c)(2)(A) (prohibiting the sale of a product as organic if, upon inspection, it is determined that pesticide or nonorganic residue is present as a "result of intentional application of a prohibited substance"). The court's reading makes no sense because no matter who applies the prohibited pesticide and no matter how the pesticide is applied, whether by drift or otherwise, the end product will be no less contaminated and no less in violation of regulations limiting such contamination.

Therefore, I dissent.